No. 78,583

STATE OF KANSAS, *Appellant*, v. FRANK LAUMONT RICE, JR., *Appellee.*
(955 P.2d 1258)

Opinion filed March 6, 1998.

*Thomas R. Stanton*, assistant county attorney, argued the cause, and *Julie Mc-Kenna*, county attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellant.

*Mike K. Sheahon*, of Sweet & Sheahon, of Salina, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: The State appeals pursuant to K.S.A. 22-3602(b)(1) from the district court's order suppressing evidence seized in a warrantless search and dismissing the case without prejudice.

Defendant Frank Rice, Jr., was one of six visitors in Carey Ford's apartment when police officers McFadden and Farris went there at approximately 2 a.m. on October 25, 1996, after receiving a dispatch about an anonymous telephone caller complaining of noise and possible use of marijuana or other narcotics. The officers heard loud music, but they detected no odor of marijuana. The uniformed officers told Ford the nature of the call and obtained her permission to enter the apartment to talk to her. Ford then consented to a search of her apartment. Meanwhile, the visitors sat in the living room, as the officers had directed them to do. The search took approximately 10 minutes, and the officers found on a

window sill a small plastic bag containing green vegetation that the officers thought was marijuana.

The officers asked if anyone would admit to owning the marijuana. No one did. Approximately 10 more minutes passed while the officers took identification and ran a warrant check on each person. Before the guests were allowed to leave, each one had to speak to Officer Farris individually in the hallway outside Ford's apartment. He asked Rice "if he knew anything about the marijuana that was found inside the apartment," or "if he had any narcotics on his person." Rice answered to both questions that he did not. Then the officer asked to search Rice. In the meantime, Officer McFadden stayed inside the apartment with the others.

Officer Farris asked each person for consent to search his or her pockets. Rice consented. In Rice's right front pants pocket, the officer found a plastic bag that contained green vegetation. The officer seized the bag and then advised Rice of his *Miranda* rights.

A month later, a two-count complaint was filed against Rice for misdemeanor possession of marijuana and misdemeanor possession of paraphernalia. Rice filed a motion to suppress evidence seized from him during the warrantless search outside Ford's apartment. The trial court concluded that the detention, search, and interrogation of Rice were unlawful and granted defendant's motion. When told that there was no other evidence against Rice, the trial court dismissed the case without prejudice. A journal entry reiterating the trial court's rulings from the bench was filed on January 16, 1997. The State filed a timely notice of appeal.

After hearing the evidence presented by the State at the hearing on defendant's motion to suppress, the trial court stated:

"Well, this is a *Vandiver* situation and the evidence is suppressed. There was an unlawful detention of the defendant. It was an unlawful search of the defendant. There was no indication whatsoever that he was free to go or that he . . . can refuse to consent to that search. . . . The *Vandiver* case is clear. It applies to exactly this type of a situation. The only distinction is that in *Vandiver* the police had a warrant to go search the place. Here they just got consent from the owner who was—there's no testimony that she was given any advice that she didn't have to consent to the search or anything else. . . . [I]f there was a loud party going on here, the . . . obvious solution to that was go in and send everybody home

and break up the party, not go in and use it for some pretense to search for drugs . . . ."

When asked to clarify whether he was ruling that Ford's consent to search her apartment was not voluntary, the trial judge indicated that the issue of her consent was immaterial: "[W]hat I'm worried about is the unlawful detention of a guest lawfully on the premises."

In *State v. Vandiver*, 257 Kan. 53, 891 P.2d 350 (1995), the defendant was one of six visitors in the apartment of David Moneymaker, a convicted drug offender, when a police officer entered the apartment to execute a search warrant. The affidavit for the warrant stated that "two marijuana purchases had occurred at the residence within the previous four days." 257 Kan. at 54-55. It did not, however, "provide a factual basis for the issuing magistrate to determine that, other than the occupant, persons within the premises would be involved in or conducting illegal drug sales." 257 Kan. at 63. The visitors were in the living room "playing a Nintendo-type game. The apartment reeked of burnt marijuana, and a baggy containing green vegetation" was in plain view on the floor in the midst of the visitors. 257 Kan. at 55. The officer "immediately arrested an individual he recognized as being involved in a drug buy several days earlier." 257 Kan. at 55. Then the officer conducted a pat-down search of Vandiver and removed a film canister from Vandiver's pants pocket. The officer testified that "he removed the canister from Vandiver's pocket 'to inspect it, not knowing what it was,' and because he was suspicious it was either a weapon or contraband. Vandiver was arrested for possession of marijuana." 257 Kan. at 55. With regard to the pat-down search, this court stated:

"In circumstances where a police officer executing a search warrant of the premises observes unusual conduct by individuals not named in the search warrant which leads the officer reasonably to conclude in light of his or her experience that criminal activity may be afoot and that the persons with whom the officer is dealing may be armed and presently dangerous, the officer is entitled for the officer's protection and the protection of others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault the officer. See K.S.A. 1994 Supp. 22-

2402; *Terry v. Ohio*, 392 U.S. [1,] 30-31 [, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968)].

"In this case, however, there is no substantial competent evidence that exigent circumstances existed to authorize the search of Vandiver. There is nothing to indicate that the officer was concerned with his safety. After entering the apartment and executing the search warrant, the officer did not recognize Vandiver, had no reason to believe that Vandiver had previously committed an offense, and did not have sufficient facts to arrest Vandiver for possession of the marijuana in plain view. Under these facts, the Court of Appeals correctly determined that under K.S.A. 22-2509(b), the officer executing the search warrant had no reason to detain Vandiver to prevent the disposal or concealment of any objects particularly described in the warrant." 257 Kan. at 63-64.

The State contends that *Vandiver* should be distinguished on its facts. There are essential factual differences—there was a warrant to search Moneymaker's apartment, but consent to search Ford's; Vandiver was subject to a pat-down, but Rice was searched for drugs; Vandiver did not consent, but Rice did. These factual differences necessitate some variants in the analysis, but the initial inquiry for both must involve the status of a guest in a private residence.

Although complaining of the trial court's reliance on *Vandiver*, the State relies on it, too, and asserts that the case stands for the proposition that officers conducting "an investigation into the ownership of controlled substances when such substances are found in the midst of several persons" "must necessarily detain those persons who are possible suspects in the commission of the crime (of possession) for a reasonable time in order to conduct the investigation." In other words, the State's position is that the visitors were detained so that Officers McFadden and Farris could determine who owned the bag of vegetation on the window sill. The State gives several hypothetical analogies, and all involve evidence of a crime being in plain view of officers entering the premises. The State glosses over the question whether principles applicable to treatment of visitors during execution of a search warrant are equally applicable in a consensual search. K.S.A. 22-2509(b), cited in *Vandiver*, provides: "In the execution of a search warrant the person executing the same may reasonably detain and search any person in the place at the time: (a) To protect himself from attack,

or (b) To prevent the disposal or concealment of any things particularly described in the warrant." One obvious difference is that when officers enter a residence with a search warrant, they have probable cause that there is criminal activity in the residence. Thus, the rationale that the State argues for the officers' detaining the visitors is based on their seeing the bag of vegetation *before* telling the visitors to sit in the living room. The officers' testimony, however, lends very little support to that sequence. The following testimony was given by McFadden on direct examination:

"Q. What did you do once you went inside the residence?

"A. We explained the nature of the call and [Ford] gave us consent to search the apartment for marijuana or any other illegal drugs.

. . . .

"Q. Did you find anything inside the apartment?

"A. Yes. Very shortly after our entry into the apartment we found a small Baggie of substance we believed to be marijuana on the window sill of the front window of the apartment.

"Q. . . . Now, what were the people, the other people who were at the apartment, doing while you conducted the search?

"A. We asked them to be seated in the main living area of the apartment.

"Q. Why did you ask them to be seated there?

"A. We—we needed to search the apartment and we wanted them to sit down while we looked for any more illegal substances and then we wanted to talk to them about what we had found on the window sill."

McFadden was not asked, nor did he volunteer, the exact order of events. It might reasonably be inferred, though, from the last answer above, that the officers did not ask the visitors to be seated in the living room until after the officers found the bag of vegetation. The balance of McFadden's testimony and all of Farris' testimony, however, give the opposite impression. In this regard, McFadden stated that the officers' intention to search the apartment was formed on the basis of the dispatch before they reached the apartment. He also testified:

"Q. . . . [W]hen you arrived you saw Mr. Rice and what did you do with Mr. Rice then?

"A. We asked him, as with the other occupants of the apartment, to have a seat in the living room."

Officer Farris gave the following testimony:

"Q. What did you do once you were inside the apartment?

"A. We located all the subjects and had them sit in the front room.

"Q. What was the reason for having them sit in the front room?

"A. To just get them all together so we could search the apartment for officers' safety.

"Q. Okay. Did anyone ask to leave at that point?

"A. No, they did not.

"Q. What did you—did you conduct the search then?

"A. Yes. The search was done while the subjects were located in the front room.

"Q. How long did that search take?

"A. The search itself maybe ten minutes.

"Q. Did you find anything during the search?

"A. Yes, we did.

"Q. What did you find?

"A. A small Baggie of green vegetation on the window sill."

On cross-examination, Farris reiterated this sequence:

"Now, you advised Ms. Ford of the reason for you being there and asked her to come into the house; is that correct?

"A. That's correct.

"Q. And I believe you testified that you wanted to search the apartment; is that correct?

"A. That's correct.

"Q. And you asked her for consent to search; is that your testimony?

"A. That's correct.

. . . .

"Q. Now, I believe you testified, sir, that when you obtained this consent you located all of the subjects and had them sit in the front room; is that your testimony?

"A. That's correct.

"Q. And would this have been done immediately before you started the search of the residence?

"A. That's correct.

"Q. Now, this, you said, I believe, was for officers' safety.

"A. Yes, sir."

Farris also stated that his intent to search the apartment was formed upon hearing the dispatch.

As noted, the greater weight of the testimony holds with the bag of vegetation being found during the search rather than its being spotted by the officers in plain view when they entered the apartment. The weight of the evidence supports, and it logically follows, that the officers detained the visitors before becoming aware of

any evidence that the crime of marijuana possession was being committed. There is no claim by the State that the anonymous tip about possible drug use at the party provided probable, or even any, reason to believe that a crime was being committed. Additional support for finding that the detention preceded the discovery of the marijuana may be seen in the absence of any plain testimony placing the bag of vegetation in plain view of the officers as they entered the apartment. Under K.S.A. 22-3216(2), "the burden of proving that the search and seizure were lawful shall be on the prosecution."

The State also argues that the officers were operating under the authorization of K.S.A. 22-2402(1) in conducting an investigation to discover who owned the marijuana. The statute is the *"Terry* stop" statute, which permits an officer to "stop any person in a public place whom such officer reasonably suspects is committing [or] has committed" a crime.

In response to the State's argument, Rice contends that K.S.A. 22-2402(1) does not apply because he was in a private residence rather than in a public place. As the court recounted in *Vandiver*, an issue in *State v. Lambert*, 238 Kan. 444, 710 P.2d 693 (1985), was whether *Ybarra v. Illinois*, 444 U.S. 85, 62 L. Ed. 2d 238, 100 S. Ct. 338 (1979), applied to searches of private property. *Ybarra* involved the search of a tavern pursuant to a warrant. Patrons of the tavern were subjected to "a cursory search" for weapons. After patting what felt like a cigarette pack with things in it, an officer retrieved from Ybarra's pants pocket a cigarette pack containing six packets of heroin. The *Vandiver* court described the United States Supreme Court's opinion in the following words:

"It noted that the police possessed a warrant based on probable cause to search the tavern in which Ybarra happened to be at the time the warrant was executed. It stated that a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person. Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person. It concluded that this requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be. The Fourth and Fourteenth Amendments protect the legitimate expectations of privacy of

persons, not places. 444 U.S. at 91. The Court ruled that '[t]he "narrow scope" of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked, even though that person happens to be on premises where an authorized narcotics search is taking place.' 444 U.S. at 94. It concluded that under the doctrine of *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), the initial frisk of Ybarra was not supported by a reasonable belief that Ybarra was armed and presently dangerous, which is required to form the predicate to a pat-down of a person for weapons. 444 U.S. at 92-93." 257 Kan. at 61.

In *Lambert*, this court held that "the principles stated in *Terry* and *Ybarra* apply equally to searches conducted on private property or on property open to the public." 238 Kan. at 448. Thus, in proper circumstances, the police may search a visitor in the course of executing a warrant for a premises search. Proper circumstances include where there is a reasonable belief that the person is armed and dangerous, where contraband is in plain view on the person, and where the visitor consents to being searched. 257 Kan. at 62.

It is abundantly clear from the following testimony of the officers that they were not concerned that any of the visitors were armed, nor did they observe anything about Rice's appearance that would indicate that he had violated, was violating, or was going to violate the law:

"Q. And when you first arrived in the home, did you observe Mr. Rice?
"A. Yes, I did.
"Q. Where did you observe him?
"A. I believe he was towards the back of the living room near the kitchen in the boundary way between those two rooms.
"Q. All right. And when you first made observation of Mr. Rice, did it appear that he was in violation of the law?
"A. No, sir.
"Q. Did it appear that he had just done something immediately before your arrival that—in violation of the law?
"A. No.
"Q. Did it appear that he was going to violate the law?
"A. No.
"Q. All right. And at any time did you have reasonable articulable suspicion that Mr. Rice had violated the law?
"A. Not until a search of his person was conducted.
"Q. And was there an odor of marijuana about the building?
"A. No, sir.

"Q. Okay. Now, so when you arrived you saw Mr. Rice and what did you do with Mr. Rice then?

"A. We asked him, as with the other occupants of the apartment, to have a seat in the living room.

"Q. You told him to have a seat?

"A. We asked them to have a seat.

"Q. You asked them. In what manner? What did you say? How did you say it?

"A. I probably said something to the effect would you people sit down in the living room.

"Q. Okay. And at that time did—let's strike that. I've already been over that. And Mr. Rice complied with your request, did he not?

"A. Yes, he did.

"Q. At any time did Mr. Rice do anything that would cause you to fear for your safety?

"A. No, sir.

"Q. So you did not conduct any type of pat-down search of Mr. Rice to insure that he didn't have any gun or weapon for your own safety; is that right?

"A. No, sir. We felt that having them all take a seat in the living room where we could observe them was sufficient.

"Q. Okay. So at that time then you did not have any concern for your own safety and you did not conduct any further type of *Terry* search of Mr. Rice, correct?

"A. *We're always concerned for our safety.*

"Q. Well, I understand, but at that particular junction?

"A. No, sir.

"Q. Okay. And he sat there pursuant to your request and he didn't get up and he didn't leave, correct?

"A. No, sir, he did not.

"Q. And did you have any outside information that Mr. Rice might have been—any tip from any informant that Mr. Rice was in any violation of the law?

"A. No, sir we didn't.

. . . .

"Q. Now, at any time prior to this time, did you seek and obtain a search warrant for the search of that residence?

"A. No, I did not.

"Q. So to clarify you did not have a search warrant, correct?

"A. Correct.

"Q. Now, I believe you testified, sir, that when you obtained this consent you located all of the subjects and had them sit in the front room; is that your testimony?

"A. That's correct.

"Q. And would this have been done immediately before you started the search of the residence?

"A. That's correct.

. . . .

"Q. At any time when these individuals were asked to sit in the front room, did you pat down any of [them] for search of weapons for your own safety?

"A. No, I did not.

"Q. Now, in any event, you asked them to sit down. Did he in fact comply?

"A. Yes, he did.

"Q. Now, at any time did Mr. Rice indicate to you that he wanted to go?

"A. No, he did not.

"Q. At any time did you or Officer McFadden indicate to Mr. Rice or any of the other individuals that they were free to go?

"A. We were detaining them until we got the warrants checked.

"Q. Until what?

"A. We were detaining them until we got the warrants checked.

"Q. To answer my question then you and Officer McFadden would not have explained to them that they were free to go?

"A. They were not free to go at that time, yes.

"[Now], when you first entered that apartment, did you observe Mr. Rice committing any crime?

"A. No, I did not.

"Q. Did you have any reasonable suspicion that he had committed a crime or was about to commit a crime?

"A. I didn't know. That's why we had him detained in the living room."

Rice advocates affirming the trial court's reasoning as well as its result. He argues that he was improperly detained and that his consent to the search of his person was "not an act of free will" because it was "so closely intertwined with the primary illegality."

The State argues that defendant's consent to Officer Farris' search of his person was not rendered involuntary by his being detained. Furthermore, the State asserts, "if there was an unreasonable, unlawful detention of Appellee by Officers McFadden and Farris, the subsequent consent given by Appellee to the search of his person was voluntary and removed any taint present because of the detention." For this proposition, the State cites *State v. Crowder*, 20 Kan. App. 2d 117, Syl. ¶ 5, 887 P.2d 698 (1994).

In *Crowder*, the Court of Appeals stated that "[t]he test for whether a seizure has occurred turns on whether a reasonable person under the totality of the circumstances would believe, based on the officer's conduct, that he was free to go. *Florida v. Bostick*, 501 U.S. 429, 115 L. Ed. 2d 389, 400, 111 S. Ct. 2382 (1991)." 20 Kan. App. 2d at 121. In the present case, Officer McFadden tes-

tified that Rice would not have been permitted to leave the living room of Ford's apartment if he had requested to do so. Thus, there is no question that Rice's being directed to sit in the living room constituted a seizure. Under *Crowder*'s holding, however, even if he was unreasonably seized, his consent to the search could operate to break the chain of events between the illegal detention and the search if his consent was voluntarily given under the totality of the circumstances. 20 Kan. App. 2d at 122. In other words, a search authorized by voluntary consent could be reasonable under the Fourth Amendment even though it followed an unreasonable seizure.

Voluntariness of consent to search is a question of fact. *State v. Johnson*, 253 Kan. 356, 364, 856 P.2d 134 (1993). "The trial court's findings with regard to the existence and voluntariness of a consent to search will not be overturned on appeal unless clearly erroneous." 253 Kan. 356, Syl. ¶ 1. Factors to be considered in determining whether the consent to search is an act of free will that was independent of the detention, the primary illegality, include "the proximity in time of the Fourth Amendment violation and the consent, intervening circumstances, and particularly the 'purpose and flagrancy' of the officers' misconduct. *U.S. v. Mendoza-Salgado*, 964 F.2d 993, 1011 (10th Cir. 1992)." *Crowder*, 20 Kan. App. 2d at 122.

In the present case, Officer McFadden's estimate of the time the visitors were detained was "roughly 15 to 20 minutes." During that time the officers spent about 10 minutes searching the apartment and then asked the visitors for identification in order to check for outstanding warrants. Circumstances intervening between the initial detention of the visitors and Rice's consent to search seem to intensify the coercive atmosphere rather than dissipate it. The officers searched the apartment and found apparent contraband, they took identification from the visitors in order to run checks on them, and, finally, the officers separated so that each visitor could be isolated from the group when questioned and asked to consent to a search of his or her person. A federal appeals court uses the phrase "exploitation of the primary illegality" to describe a circumstance when police use fruits of the primary illegality to coerce a

defendant into granting consent to search. *United States v. Carson*, 793 F.2d 1141, 1148 (10th Cir.), *cert. denied* 479 U.S. 914 (1986). A police request for consent to search does not itself constitute exploitation of the primary illegality, but the consent may be combined with other, more coercive, police conduct so that the resulting consent is not voluntary. In the present case, it appears that the contraband discovered while the visitors were detained probably became an important article in the intensifying pressure applied by the officers to the visitors. See 793 F.2d 1141. The officers' conduct, although perhaps misguided rather than brutal or racially motivated or otherwise morally reprehensible, exceeds the bounds of constitutionality in a purposeful and obvious way. The prosecutor's seemingly sincere argument that the police were simply doing their jobs by conducting an investigation into suspected criminal activity begs the question. The duty to investigate an anonymous telephone call does not justify the unlawful detention of an innocent nonresident visitor in a private residence. In *U.S. v. Shareef*, 100 F.3d 1491 (10th Cir. 1996), the trial court had suppressed evidence obtained as a result of the defendant's detention following a traffic stop. The court found the stop analogous to an investigative detention and stated:

"We therefore analyze such stops under the principles set forth in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). In evaluating the reasonableness of an investigative detention, we make a dual inquiry, considering first 'whether the officer's action was justified at its inception,' and second 'whether it was reasonably related in scope to the circumstances which justified the interference in the first place.' *Terry*, 392 U.S. at 20, 88 S. Ct. at 1879. 'The government has the burden of demonstrating that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.' *United States v. Perdue*, 8 F.3d 1455, 1462 (10th Cir. 1993). If the detention is not so limited, the stop may only be justified by probable cause or consent. *Id.*" 100 F.3d at 1500-01.

Here, there was no criminal activity to investigate prior to finding the marijuana on the window sill. The officers admittedly did not have a reasonable suspicion of any criminal activity on the part of Rice when they first entered the apartment or upon discovery of the marijuana on the window sill. The detention of Rice was unlawful from the moment he was ordered to sit down in the front

room up to and including the search of his person. There were no intervening circumstances which separated Rice's "consent" from the unlawful detention. The officers had no reasonable basis to detain Rice. Further, the prosecution's alluding to the trial court's "rampage" and "personal dislike toward the investigation and prosecution of drug crimes" and suggesting that the trial court's ruling was based upon "personal bias" rather than on the evidence reflects poorly on the State and tends to discredit its argument.

The district court's finding that Rice's detention was unlawful is supported by substantial competent evidence. As to Rice's consent to search, the district court's finding that it was not voluntary is not clearly erroneous.

Affirmed.