(151 P.3d 857)
No. 95,716

STATE OF KANSAS, *Appellee*, v. SALVADOR ANGUIANO, *Appellant*.

Opinion filed February 16, 2007.

*Rachel L. Pickering*, of Kansas Appellate Defender Office, for appellant.

*Don L. Scott*, county attorney, and *Phill Kline*, attorney general, for appellee.

Before RULON, C.J., GREENE and HILL, JJ.

GREENE, J.: Salvador Anguiano appeals the district court's denial of his motion to suppress, arguing that the incriminating evidence was seized during an illegal detention. Although he ultimately consented to a search of his person, Anguiano argues that his consent was not voluntary and did not purge the taint of his illegal detention. Finally, Anguiano argues that he should have been advised of his rights under *Miranda* before he was interrogated. See *Miranda v. Arizona*, 385 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, *reh. denied*, 385 U.S. 890 (1966). We agree with Anguiano on the issues surrounding his search; his motion to suppress should have been granted and we thus reverse his conviction. Anguiano's *Miranda* argument is accordingly rendered moot.

### Factual and Procedural Overview

On St. Patrick's Day, 2005, a sheriff's deputy was on patrol when he observed a man walking whom he believed "semifit" the description of a wanted man. The description included only that the man was Hispanic and wearing a coat and "dark-type green colored pants." The man observed by the deputy, later identified as Anguiano, had on dark-colored, grayish-green pants and a coat. When the deputy approached Anguiano, he "looked away," causing the deputy to believe Anguiano was attempting to avoid being identified.

The deputy pulled his patrol car up to Anguiano and asked for his name and origin of travel; Anguiano stated his name and told

the deputy he was coming from the National Beef plant. This statement, however, "didn't make sense" to the officer because Anguiano would have been walking in the opposite direction if he had been coming from the plant. The deputy then got out of his car, stopped the man, and engaged in further conversation, including another request for identification to run through dispatch for aliases or outstanding warrants. The deputy also asked Anguiano if he had been to apartments in the area, which were known to be a source for drugs, and whether he had bought drugs. When Anguiano answered in the negative, the deputy asked if he could search him. Anguiano consented, and a silver container with a white powdery substance, later determined to be cocaine, was found in Anguiano's right-hand coat pocket. The deputy arrested Anguiano within approximately 6 minutes of his call to dispatch.

On March 18, 2005, the State charged Anguiano with possession of cocaine, in contravention of K.S.A. 65-4160. Anguiano filed a motion to suppress, and a motions hearing was held on June 20, 2005. The court concluded that the deputy had reasonable suspicion to stop Anguiano, that there was reason to further investigate, and that Anguiano's consent to the search was voluntary. The motion to suppress was denied.

At a subsequent jury trial, Anguiano was found guilty of possession of cocaine. He was sentenced to an underlying prison sentence of 11 months, but he was given probation. He timely appeals.

### Standard of Review

We give deference to the factual findings of the district court on review of a ruling on a motion to suppress and uphold those findings if they are supported by substantial competent evidence. *State v. Bone*, 27 Kan. App. 2d 582, 583, 6 P.3d 914 (2000). The voluntariness of a consent to search must be determined from the totality of the circumstances and is a question of fact. *State v. Rice*, 264 Kan. 232, 242, 955 P.2d 1258 (1998). The ultimate determination whether evidence should be suppressed is a legal question requiring independent appellate consideration. *State v. Grace*, 28 Kan. App. 2d 452, 456, 17 P.3d 951, *rev. denied* 271 Kan. 1039 (2001). On a motion to suppress, the State bears the burden of

proving the lawfulness of a search and seizure. *State v. Shelton*, 278 Kan. 287, 292, 93 P.3d 1200 (2004).

### *Did the District Court Err in Denying the Motion to Suppress?*

Proper appellate analysis of a case such as this requires that we follow these steps:

"(a) Did the interaction between the [officer] and [suspect] result from a voluntary encounter rather than a stop or seizure subject to Fourth Amendment evaluation? (b) If the initial contact did not qualify as a stop, did the continued contact convert an otherwise voluntary encounter into an investigatory detention? (c) If the initial contact qualified as a stop or the continued contact converted a voluntary encounter into an investigatory detention, was it based on a reasonable and articulable suspicion that [suspect] had committed, [was] committing, or [was] about to commit a crime? (d) If the stop or detention was unlawful, is the appellate record sufficient to enable us to analyze whether the consent purged whatever taint arose? and/or (e) If the appellate record is sufficient for us to make a determination, did the consent purge the taint here?" *Grace*, 28 Kan. App. 2d at 456.

Our appellate courts have recognized that encounters between police and citizens may be categorized into four types: voluntary encounters, investigatory stops, public safety stops, and arrests. *State v. Gonzalez*, 36 Kan. App. 2d 446, 451, 141 P.3d 501 (2006). Voluntary encounters are not considered seizures within the meaning of the Fourth Amendment to the United States Constitution. *State v. Crowder*, 20 Kan. App. 2d 117, 119, 887 P.2d 698 (1994). A voluntary encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature. *Florida v. Bostick*, 501 U.S. 429, 434, 115 L. Ed. 2d 389, 111 S. Ct. 2382 (1991). So long as a reasonable person would feel free to disregard the police and go about his or her business, the encounter remains consensual and no reasonable suspicion is required. *State v. Reason*, 263 Kan. 405, 410, 951 P.2d 538 (1997). Once a voluntary encounter is converted to an investigatory detention, there must be reasonable suspicion, based upon objective facts, that the individual was or is involved in criminal activity. *State v. Epperson*, 237 Kan. 707, 712, 703 P.2d 761 (1985). Something more than an unparticularized suspicion or hunch must be articulated. *State v. DeMarco*, 263 Kan. 727, Syl. ¶ 4, 952 P.2d 1276 (1998).

Under the exclusionary rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure. The rule's primary purpose is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures. *United States v. Calandra*, 414 U.S. 338, 347, 38 L. Ed. 2d 561, 94 S. Ct. 613 (1974).

### *Proper Legal Characterization of the Encounter-Reasonable and Articulable Suspicion?*

The district judge's analysis from the bench was as follows:

"I think the deputy, even though he didn't have a full or a complete description, he was looking for somebody who was a Hispanic male wearing dark green pants and a coat. Mr. Anguiano matched that description. So the deputy certainly had the authority to make a brief stop of Mr. Anguiano to inquire further.

"The deputy's testimony was that he pulled up next to Mr. Anguiano, asked him who he was and what he was doing. Mr. Anguiano said that he was coming from National Beef, which was a different direction than what the deputy watched Mr. Anguiano come from. I think that the deputy was within his rights to further his investigation at that point because he had contact with a person with which he had some suspicion about and who gave him a story that was not complete with what he had witnessed.

"The deputy had the right to ask for identification and to check to see if the name given was an alias of this David Garcia. He could have also have called in and asked for a more accurate description, such as height, weight, things of that nature, of Mr. Garcia.

"[A]nd in the interim [the deputy could] ask for consent to search. And the testimony given here today was that Mr. Anguiano acquiesced and consented to a search of his person.

"I find that there is nothing presented that would indicate that the consent was coerced."

Our problem with the district court's analysis is that the officer admitted that after his initial questions, he stopped Anguiano and believed that he was not free to leave at that time. Thus, we must analyze whether there was a reasonable articulable suspicion of criminal involvement at the moment Anguiano was seized. See *DeMarco*, 263 Kan. at 734. The only bases stated by the officer were that (i) Anguiano "semifit" a description of someone wanted on a felony warrant and (ii) Anguiano's statement that he was "com-

ing from National Beef" did not make sense to the officer given the direction of Anguiano's travel. We conclude that neither of these bases, whether considered separately or together, supported a reasonable suspicion of criminal activity.

As to the first stated basis, we note that the only description provided to the officer was that the person wanted was a Hispanic man and wore a coat and "dark-type green" colored pants. We believe that the description is so nonspecific or generic in nature as to defy reasonable suspicion of criminal activity. Not only did the officer admit that Anguiano's pants were "grayish-green" rather than "dark-type green," merely being Hispanic and wearing a coat with green pants may have described much of the population of Seward County on St. Patrick's Day, March 17, 2005. As noted by the district court, "there's a lot of things that are descriptive besides what somebody's wearing [such as] age, height, hair color, race, [and] weight."

As to the second stated basis, we believe that a direction of travel seemingly inconsistent with a stated location of origin—standing alone—likewise defies reasonable suspicion of criminal activity. Not only is travel direction potentially dependent on origin, it is also dependent on destination and any intermediary stops, none of which were inquired about or known to the officer until later in the encounter. Most importantly, however, mere inconsistency between origin and direction of travel fails to provide reasonable suspicion of involvement in criminal activity. See *Epperson*, 237 Kan. at 712-13 (absent objective facts to form a belief of involvement in criminal activity, even a brief detention is illegal). Moreover, mere presence in a high-crime area standing alone is insufficient to create reasonable suspicion. *Illinois v. Wardlow*, 528 U.S. 119, 124, 145 L. Ed. 2d 570, 120 S. Ct. 673 (2000). Even if we consider the collective knowledge of both stated bases, we fail to recognize objective particularized facts in support of reasonable suspicion. See *Epperson*, 237 Kan. at 713-14; *State v. Hamic*, 35 Kan. App. 2d 202, Syl. ¶ ¶ 2, 3, 4, 129 P.3d 114 (2006).

We simply conclude that the officer had no particularized and objective basis for suspecting Anguiano was involved in criminal activity, and unless his later consent to search purged the taint of

his unlawful stop and detention, the motion to suppress should have been granted. See *Grace*, 28 Kan. App. 2d at 458-59.

### *Taint Analysis—Did the Consent Purge any Illegality?*

If a person consents to a search after an illegal stop or during an illegal detention, the court must evaluate whether the consent purged the taint of the earlier illegality. See *Rice*, 264 Kan. at 241-42. If the district court did not specifically apply the taint analysis to the consent, the appellate court is empowered to do so upon a sufficient record on appeal. *State v. Crowder*, 20 Kan. App. 2d 117, 122, 887 P.2d 698 (1994). The factors to be considered in the taint analysis are the proximity in time of the Fourth Amendment violation and the consent, intervening circumstances, and particularly the purpose and flagrancy of the officers' misconduct. *Rice*, 264 Kan. at 242. In addition to proving the voluntariness of the consent, the State must also establish a break in the causal connection between the illegality and the evidence thereby obtained. *Grace*, 28 Kan. App. 2d at 460.

Here, as was the case in *Grace*, "we can certainly imagine worse abuses of police authority." 28 Kan. App. 2d at 460. It does not appear from the record that the encounter was remarkable for any officer misconduct. We note, however, that there were no intervening circumstances to separate Anguiano's consent from his unlawful detention; in fact, the only intervening events were a short conversation wherein the officer asked for Anguiano's name, the officer's initiation of a wants and warrants check, and the officer's question whether Anguiano had purchased drugs from nearby apartments. We conclude that none of these events adequately separated the consent from the illegal detention. See *Rice*, 264 Kan. at 241-44; see *Grace*, 28 Kan. App. 2d at 460-61. Finally, Anguiano's brief on appeal emphasizes at least two material discrepancies between the officer's testimony at the suppression hearing and his testimony at trial; as in *Grace*, "this variability in the officer's story does not fill us with confidence." 28 Kan. App. 2d at 460-61.

Considering the totality of the circumstances, we hold that Anguiano's consent did not purge the taint of the illegal stop and

detention. The evidence procured from the subsequent search should have been suppressed as fruit of the poisonous tree under *Wong Sun v. United States*, 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963). Anguiano's motion to suppress should have been granted; thus, we reverse his conviction.

Reversed.