No. 99,457

STATE OF KANSAS, *Appellee*, v. MAURICE J. WALKER, *Appellant*.

(251 P.3d 618)

Opinion filed April 1, 2011.

*Ryan J. Eddinger*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Robbin L. Wasson*, assistant district attorney, argued the cause, and *Jerome Gorman*, district attorney, and *Steve Six*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

NUSS, C.J.: The district court denied Maurice J. Walker's motion to suppress evidence, and a jury convicted him of possession of cocaine and marijuana discovered during a pedestrian stop. The Court of Appeals affirmed. We granted Walker's petition for review under K.S.A. 20-3018(b).

The issues on appeal and our accompanying holdings are as follows:

1.   Did the officer have reasonable suspicion to detain Walker? Yes.

2.   Did the officer exceed the scope of the detention by running a records check on Walker? No.

Accordingly, we affirm the decisions of the Court of Appeals and the district court.

## FACTS

On September 16, 2006, Kansas City, Kansas police officer Jason D. Pittman was driving a marked patrol car when a pedestrian, Angel Torono, flagged him down on Central Avenue at 5:55 p.m. Torono did not speak English. With two children translating, he told Officer Pittman that a man burglarized his truck minutes earlier. Torono described the man as "a black male wearing a black shirt and black shorts." He alleged that the man "broke out the side window of [Torono's] truck and removed a CD case, then went walking eastbound on Central Avenue from that location." Pittman asked Torono and the two children to stay put while he searched for the suspect.

Pittman drove in the suspect's direction of travel: eastbound on Central Avenue. At 10th and Central—approximately two blocks from the crime scene—Pittman spotted Walker, whom he described as "a black male wearing a black t-shirt and black shorts," sitting next to a bus stop. Pittman parked near the bus stop, exited his car, and approached Walker. According to Pittman, he "told [Walker] the reason I came up to him, that he fit the description of a suspect in an incident that occurred up the street and asked him if he had any identification."

Pittman and Walker offered conflicting testimony on the rest of their encounter. According to Pittman, he asked Walker for identification, and Walker produced a Missouri ID. Pittman provided Walker's information to police dispatch for a records check, which revealed an arrest warrant for Walker in Kansas City. Pittman then arrested Walker per the warrant. The resultant search incident to arrest revealed one clear plastic baggy of marijuana and another one of cocaine in Walker's pockets.

In contrast, Walker testified that he started to remove his backpack to obtain his ID when Pittman placed him under arrest. According to Walker, Pittman then searched the backpack, removed the wallet, and asked Walker to take the ID out of the wallet. Walker replied, "[W]ell, I'm handcuffed. Why do you think I can take it out?" Pittman's continued search of the backpack revealed a CD with Walker's initials on it. Walker claims that only after

Pittman finished searching the backpack did he run a records check, *i.e.*, once Walker was already under arrest.

Walker admitted ownership of the marijuana. But he claimed he took the cocaine from a kid in an alley and intended to throw it away. Sergeant George Sims arrived to conduct a field test of the two substances found on Walker. Sims testified that the substances tested positive for marijuana and cocaine, while Walker alleges that Sims said they tested negative while on site.

The State charged Walker with one count of possession of cocaine in violation of K.S.A. 65-4160(a) and one count of possession of marijuana in violation of K.S.A. 65-4162(a). Walker filed a pretrial motion to suppress the drug evidence, essentially arguing that Pittman did not have reasonable suspicion to detain him because the description of the suspect was "grossly inadequate."

In denying the motion, the district judge stated in relevant part:

"[T]he officer had a legal justification to inquire of a possible suspect who matched the description of the perpetrator of a crime only minutes before. It was a detention. He ascertained his identity. The defendant cooperated. He gave him some sort of a Missouri identification card.

"At that point, the officer found out there was an active arrest warrant for the defendant. At that point in time, the arrest was legal, it was constitutional, and the subsequent search was legal and constitutional."

A jury found Walker guilty on both counts. He appealed, but a Court of Appeals panel affirmed his convictions in *State v. Walker*, 41 Kan. App. 2d 337, 202 P.3d 685 (2009). We granted Walker's petition for review.

More facts will be added as necessary to the analysis.

### ANALYSIS

Issue 1: *The officer had reasonable suspicion to detain Walker.*

Walker argues that the district court erred in denying his motion to suppress. He contends that the encounter with Officer Pittman was not only an investigatory detention but it was also unsupported by reasonable suspicion of criminal activity. Walker specifically argues that a reasonable person would not feel free to terminate an encounter with a police officer after learning he or she is a possible suspect in criminal activity. Walker further argues that the suspect's

description—a black male wearing a black shirt and black shorts—was insufficient to provide Pittman with a reasonable and articulable suspicion that Walker committed a crime. Walker particularly points to the fact that his shirt was dark blue, with a picture of Mickey Mouse on the front. Consequently, Walker demands that all evidence obtained be excluded as fruit of the poisonous tree. See *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963).

The State responds that the encounter was consensual and did not become an investigatory detention until Pittman discovered Walker's arrest warrant. In the alternative, if the encounter was an investigatory detention from the onset, the State argues that Pittman possessed reasonable suspicion. It points out that Walker matched the suspect's description, he was the only person Pittman saw matching the description, he was located within minutes of the crime, and he was found just two blocks away.

### Standard of Review

When reviewing general motions to suppress evidence, we employ the following standard of review:

" ' " '[T]his court reviews the factual underpinnings of a district court's decision for substantial competent evidence and the ultimate legal conclusion drawn from those facts de novo. The ultimate determination of the suppression of evidence is a legal question requiring independent appellate review. [Citation omitted.] The State bears the burden to demonstrate that a challenged search or seizure was lawful. [Citation omitted.]' " ' " *State v. Thomas*, 291 Kan. 676, 682, 246 P.3d 678 (2011) (quoting *State v. McGinnis*, 290 Kan. 547, 551, 233 P.3d 246 [2010]).

Walker contends that the facts material to our decision are not in dispute and, therefore, the question of whether to suppress is a question of law. See, *e.g.*, *State v. Ingram*, 279 Kan. 745, 113 P.3d 228 (2005). But as noted above, the parties disagree on when Walker was arrested during the encounter and on the results of the field tests. As a result, we will employ the mixed standard recently affirmed in *State v. Thomas*.

### Valid Investigatory Detention

Similar to our recent holdings in *Thomas* and *McGinnis*, the present case concerns an officer's questioning and eventual arrest

of a pedestrian. We established our analytical framework in *McGinnis*:

"The United States Supreme Court has developed a 'totality of the circumstances' test to determine if there is a seizure, or instead a consensual encounter. See *State v. Thompson*, 284 Kan. 763, 775, 166 P.3d 1015 (2007). '[U]nder the test, law enforcement interaction with a person is consensual, not a seizure if, under the totality of the circumstances, the law enforcement officer's conduct conveys to a reasonable person that he or she was free to refuse the requests or otherwise end the encounter.' 284 Kan. at 775. Stated another way, ' "[s]o long as a reasonable person would feel free to 'disregard the police and go about his business,' [citation omitted], the encounter is consensual and no reasonable suspicion is required." ' *State v. Reason*, 263 Kan. 405, 410, 951 P.2d 538 (1997) (quoting *Florida v. Bostick*, 501 U.S. 429, 434, 111 S. Ct. 2382, 115 L. Ed. 2d 389 [1991]). Consequently, in *Reason* we held that only if ' " 'the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred.' " ' 263 Kan. at 410-11.

. . . .

"We begin our analysis by acknowledging that a seizure does not occur simply because a police officer approaches an individual and asks a few questions:

'[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen . . . . [Citations omitted.] Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. [Citation omitted.] The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. [Citations omitted.]' *Florida v. Royer*, 460 U.S. 491, 497-98, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983).'

See *Thompson*, 284 Kan. 763, Syl. ¶ 17 ('Law enforcement questioning, by itself, is unlikely to result in a Fourth Amendment violation. Unless the surrounding conditions are so intimidating as to demonstrate that a reasonable person would have believed he or she was not free to disregard the questions, there has been no intrusion upon the detained person's liberty or privacy that would implicate the Fourth Amendment.').

"Accordingly, over the years we have recognized several objective factors to help determine whether a law enforcement-citizen encounter is voluntary or an investigatory detention. This nonexhaustive and nonexclusive list includes: the presence of more than one officer, the display of a weapon, physical contact by the officer, use of a commanding tone of voice, activation of sirens or flashers, a command to halt or to approach, and an attempt to control the ability to flee. See

*State v. Lee*, 283 Kan. 771, 775, 156 P.3d 1284 (2007); *State v. Morris*, 276 Kan. 11, 19-20, 72 P.3d 570 (2003); *State v. Gross*, 39 Kan. App. 2d 788, 798-800, 184 P.3d 978 (2008).

"There is no rigid application of these factors; instead, we analyze the facts of each case independently. We have held that '[i]n applying the totality of the circumstances test in a Fourth Amendment context, no one factor is legally determinative, dispositive, or paramount. The outcome does not turn on the presence or absence of a single controlling or infallible touchstone and requires careful scrutiny of all the surrounding circumstances.' *Thompson*, 284 Kan. 763, Syl. ¶ 20. On the other hand, 'we do not expect courts to merely count the number of factors weighing on one side of the determination or the other. In the totality of the circumstances, a factor may be more indicative of a coercive atmosphere in one case than in another. [Citations omitted.]' 284 Kan. at 804." *McGinnis*, 290 Kan. at 552-53.

Walker contends that a reasonable person would not have felt free to refuse the requests or otherwise end the encounter under the totality of the circumstances. This specific subset of suppression determinations—the trial court's determination of whether the encounter is consensual or a seizure—is also a mixed question of fact and law. *McGinnis*, 290 Kan. at 552. We agree with Walker that the encounter was a seizure.

In *McGinnis*, an officer approached the defendant and asked if he had knowledge or information about a partially submerged vehicle nearby. The officer did not initially suspect the defendant of criminal activity and did not mention to him that the submerged vehicle was allegedly stolen. We determined the officer's question was innocuous and that under all the circumstances, the encounter was voluntary. We reiterated that a court must consider all the circumstances surrounding the encounter " ' "to determine whether the police conduct *would have communicated to a reasonable person* that the person was not free to decline the officers' request or otherwise terminate the encounter." ' " (Emphasis added.) 290 Kan. at 556 (quoting *State v. Reason*, 263 Kan. at 411).

Here, by contrast, Pittman approached Walker to confirm or dispel Pittman's belief that Walker might be the person who broke into Torono's truck. Pittman also immediately conveyed his intentions to Walker: Pittman told Walker he was talking to Walker because he fit the suspect's description in a nearby criminal inci-

dent and immediately asked for Walker's ID. Consequently, unlike the officer in *McGinnis*, Pittman's statement and accompanying question were not innocuous. Under these circumstances, we conclude that a reasonable person in Walker's position would not feel free to refuse Pittman's request or otherwise terminate the encounter. *Cf. State v. Thompson*, 284 Kan. at 804 ("[W]e do not expect courts to merely count the number of factors weighing on one side of the determination or the other. In the totality of circumstances, a factor may be more indicative of a coercive atmosphere in one case than in another.").

Nevertheless, investigatory detentions are generally permitted under the Fourth Amendment to the United States Constitution and K.S.A. 22-2402 if " 'an objective officer would have a reasonable and articulable suspicion that the detainee committed, is about to commit, or is committing a crime.' " *Thomas*, 291 Kan. 676, 687, 246 P.3d 678 (2011) (quoting *State v. Pollman*, 286 Kan. 881, 889, 190 P.3d 234 [2008]).

The district court essentially held that reasonable suspicion existed: "[T]he officer had a legal justification to inquire of a possible suspect who matched the description of the perpetrator of a crime only minutes before." We recently discussed considerations for how "reasonable suspicion" is evaluated in *Thomas*, 291 Kan. 687-88, where we stated:

> " ' " 'What is reasonable is based on the totality of the circumstances and is viewed in terms as understood by those versed in the field of law enforcement.' [quoting *State v. Toney*, 253 Kan. 651, 656, 862 P.2d 350 (1993)] . . . .
>
> " '[W]e judge the officer's conduct in light of common sense and ordinary human experience. [Citation omitted.] "Our task . . . is not to pigeonhole each purported fact as either consistent with innocen[ce] . . . or manifestly suspicious," [citation omitted], but to determine whether the totality of the circumstances justify the detention. [Citation omitted.] We make our determination with deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances, [citation omitted], remembering that reasonable suspicion represents a "minimum level of objective justification" which is "considerably less than proof of wrongdoing by a preponderance of the evidence." ' " 263 Kan. at 734-35 (quoting *United States v. Mendez*, 118 F.3d 1426, 1431 [10th Cir. 1997]; citing

*United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 104 L. Ed. 2d 1 [1989]).'

"Similarly, the United States Supreme Court has stated:

"While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification . . . . [Citation omitted.] The officer must be able to articulate more than an 'inchoate and unparticularized suspicion or "hunch" ' of criminal activity. [Citation omitted.]" *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000).' *Moore*, 283 Kan. at 354-55.

"Whether reasonable suspicion exists is a question of law. We use a mixed question standard of review, determining whether substantial competent evidence supports the district court's findings, while the legal conclusion is reviewed de novo. *Moore*, 283 Kan. at 350 (citing *Ornelas v. United States*, 517 U.S. 690, 699, 116 S. Ct. 1657, 134 L. Ed. 2d 911 [1996])."

In support of Walker's position that the district court erred and that Pittman did not possess reasonable suspicion, Walker cites *State v. Anguiano*, 37 Kan. App. 2d 202, 151 P.3d 857 (2007). There, an officer was on patrol on St. Patrick's Day when he noticed a pedestrian that "semifit" the description of a wanted man. "The description included only that the [wanted] man was Hispanic and wearing a coat and 'dark-type green colored pants.' " 37 Kan. App. 2d at 203.

The pedestrian, Anguiano, was wearing dark-colored, grayish-green pants and a coat. The officer stopped his patrol car by the pedestrian and asked for his name and origin of travel. The officer thought Anguiano's direction of travel was inconsistent with his answer given. As a result, the officer asked for identification and ran the information through dispatch "for aliases or outstanding warrants." The opinion does not indicate the response, if any, dispatch provided to the alias and warrants check. But Anguiano consented to a search of his person, which produced cocaine. 37 Kan. App. 2d at 203-04.

The *Anguiano* court held that the encounter was not only an investigatory detention, but also that Anguiano's "semifit" of the description provided was insufficient to form reasonable suspicion. The court opined:

"[T]he description is so nonspecific or generic in nature as to defy reasonable suspicion of criminal activity. Not only did the officer admit that Anguiano's pants were 'grayish-green' rather than 'dark-type green,' merely being Hispanic and wearing a coat with green pants may have described much of the population of Seward County on St. Patrick's Day." 37 Kan. App. 2d at 207.

In the instant case, the Court of Appeals panel distinguished *Anguiano*, writing:

"[T]he sole basis for [Anguiano's] detention was a 'semifit' general description. Here, the victim gave Officer Pittman the direction the suspect was last seen traveling. The crime occurred only a few minutes prior to Officer Pittman's arrival. And unlike in *Anguiano*, September 16 is not traditionally a day when individuals dress similarly by wearing dark-colored clothes." 41 Kan. App. 2d at 341-42.

For the reasons given by the panel, we agree that *Anguiano* is distinguishable from the present case. We further note that pedestrian Walker was located in the direction the suspect had been said to flee on foot, within 5 minutes and two blocks of the reported crime. Accordingly, we find better guidance in *State v. Baker*, 239 Kan. 403, 720 P.2d 1112 (1986), and *State v. Glass*, 40 Kan. App. 2d 379, 192 P.3d 651 (2008).

In *Baker*, while the armed robbers of a gas station fled, the clerk called the police. Dispatch informed officers of an armed robbery by two black men in black jackets and blue jeans. Two officers, located 16 blocks from the reported robbery, then drove toward the robbery on separate side streets they believed could be used for a getaway. One officer saw no traffic until he observed a white automobile with three black males in dark clothes approaching from the direction of the robbery. He decided to check the vehicle and its occupants further. The officer followed the automobile to the next intersection, where it was parked at the curb with the lights out. As the officer approached, the lights on the automobile turned on in preparation for leaving. He activated his emergency lights and ordered the occupants out. All were in dark clothing: at least two were in black jackets and blue jeans.

The *Baker* court held that although the report was of two robbers and there was no indication of how they made their getaway, it was not unreasonable for the officers to anticipate the robbers fled in a waiting vehicle with a third person acting as the wheelman.

In light of all the information available to the officer, when coupled with the officer's background, training, and experience, we determined that he possessed reasonable suspicion to make the stop.

In *Glass*, police dispatch described two suspects, within 30 seconds of a reported liquor store robbery, as "black males wearing white t-shirts and black hooded zip-up jackets, who left westbound on foot around the building." 40 Kan. App. 2d at 380. A few blocks from the liquor store and within 1 minute of receiving the dispatch, an officer noticed a lone vehicle traveling away from the crime scene. The officer drove past the vehicle, shone a light inside, and noticed "two black males in the front seat. One was wearing a white t-shirt and the other was wearing a black outfit." The officer stopped the car, and eventually arrested the occupants after finding one was stuffing something between seat and console and another had a large sum of money fall out of his lap. 40 Kan. App. 2d at 380-81.

The *Glass* panel rejected the defendant's motion to suppress and determined that the officer possessed reasonable suspicion to stop the vehicle based on five factors. First, as in *Baker*, the information given to police was reputable and from an identified citizen. Second, similar to *Baker*, the officer observed the suspect vehicle traveling away from the crime scene using a known "back way." Third, "mirroring the facts in *Baker*," the officer located the vehicle within 1 minute of the reported robbery and only a few blocks from the crime scene. Indeed, it was the only vehicle in the area observed by the officer. Fourth, unlike *Baker*, the officer noticed two black males inside the vehicle "identical to [the citizen's] description of the number, race, and sex of the robbers." Fifth, akin to *Baker*, one of the occupants was wearing dark clothing, consistent with the suspect's description. 40 Kan. App. 2d at 385-86.

In considering the facts, rationale, and holdings of *Baker* and *Glass*, and viewing the totality of the circumstances, we conclude as a matter of law Pittman possessed reasonable suspicion to detain Walker. *Moore*, 283 Kan. at 350. First, Pittman received information from an identified citizen, Torono. Second, although Walker was not found while traveling away from the crime scene, he was found sitting at a bus stop east of the crime—the direction Torono

told Pittman the suspect had fled on foot. Third, Walker was located within 5 minutes and within two blocks of the reported crime. Fourth, Walker was found sitting alone: identical to Torono's description of the race, gender, and number of the suspects, *i.e.*, one black male. Fifth, Walker was dressed in dark shorts and t-shirt, consistent with the description provided.

Walker primarily argues that Torono's description was overbroad and that Walker did not match it. More particularly, he contends his shirt's color was midnight blue and featured Mickey Mouse on its front. However, we hold it is possible that someone could identify the shirt as black and similarly fail to mention Mr. Mouse if the shirt had been viewed from behind. Indeed, when Torono saw Walker at the scene and Pittman later spotted Walker at the bus stop, they each described the clothes as black shirt and black shorts.

We observe that other jurisdictions have found reasonable suspicion based on similar descriptions of the suspect's clothing, in light of the totality of the circumstances. See, *e.g.*, *Commonwealth v. Dargon*, 457 Mass. 387, 930 N.E.2d 707 (2010) (suspect was wearing blue jacket with white markings and fled toward waterfront); *People v. Ross*, 317 Ill. App. 3d 26, 28, 739 N.E.2d 50 (2000) (suspect described as "black man wearing blue shirt and pants" was found one half-block away from reported crime scene); *State v. Taylor*, 965 S.W.2d 257, 259 (Mo. Ct. App. 1998) (suspect described as "black male wearing a black skullcap, a full length black coat, and having his right hand in his front coat pocket" was found three blocks from reported crime within minutes of report).

Issue 2: *Officer Pittman's records check did not exceed the scope of the legally commenced detention.*

Walker next argues that if the stop was supported by reasonable suspicion, that Officer Pittman exceeded its scope. More specifically, Walker contends that the purpose of the encounter·was to investigate the alleged burglary and that Pittman abandoned that investigation when he conducted a general and unrelated records check.

The State responds that police, in general, should be permitted to run such checks during investigatory detentions to "determine

who [the officer] was talking with and whether that person ha[s] a history [the officer] should be aware of." We observe that the United States Supreme Court has held: "[I]f there are articulable facts supporting a reasonable suspicion that a person has committed a criminal offense, that person may be stopped in order to identify him, . . . or to . . . obtain additional information." *Hayes v. Florida*, 470 U.S. 811, 816, 105 S. Ct. 1643, 84 L. Ed. 2d 705 (1985).

The Court of Appeals panel acknowledged K.S.A. 22-2402(a) which provides that, when stopping a suspect whom an officer reasonably suspects is committing, has committed, or is about to commit a crime, the officer may demand the suspect's name, address, and an explanation of the suspect's action. The panel also acknowledged the statute does not expressly authorize running a computer records check on the pedestrian suspect, although this court has authorized drivers' records checks during traffic stops for which reasonable suspicion exists. See, *e.g.*, *State v. Smith*, 286 Kan. 402, 410, 184 P.3d 890 (2008); *State v. DeMarco*, 263 Kan. 727, 952 P.2d 1276 (1998); *State v. Damm*, 246 Kan. 220, 787 P.2d 1185 (1990).

The panel held that Pittman's records check did not exceed the permissible scope of the encounter. Noting that no Kansas case discusses the validity of a records check during a police-pedestrian encounter, the panel adopted the rationale of the court in *United States v. Villagrana-Flores*, 467 F.3d 1269 (10th Cir. 2006), *cert. denied* 549 U.S. 1149 (2007).

In *Villagrana-Flores*, an officer detained the defendant, whom he believed was a danger to himself and others. During the detention, the officer ran a warrants check which revealed outstanding warrants and prior deportations on the defendant. After determining that the encounter was a valid *Terry* stop, the court analyzed whether the officer was justified in using defendant's identification to run the warrants check during the course of the stop. "In other words, we must determine whether running a warrants check was 'reasonably related in scope to the circumstances which justified the interference in the first place.'" 467 F.3d at 1276.

The *Villagrana-Flores* court extended its reasoning from traffic stop cases, in which an officer has the right to run a background check on drivers unrelated to the purpose of the stop, to police-pedestrian encounters. The court reasoned that both types of encounters implicate officer safety, and the officer in both situations has a "strong interest in knowing whether th[e] individual has a violent past or is currently wanted on outstanding warrants." 467 F.3d at 1277. Such a result "also 'promotes the strong government interest in solving crimes and bringing offenders to justice.' [Citation omitted.]" 467 F.3d at 1277. The court observed in a footnote that "the Fourth Amendment is not implicated simply because a name, legally obtained, is later used to run a criminal background check. That action is neither a search nor a seizure, for there is no legitimate expectation of privacy in one's criminal history." 467 F.3d 1277 n.4.

See also *United States v. Vance*, 553 F. Supp. 2d 1308, 1318 (D. Utah 2008) (citing *Villagrana-Flores*, holding the officer's decision to run a warrants check on defendant after the investigatory detention began was not violation of defendant's Fourth Amendment rights); see, *e.g.*, *State v. Markland*, 112 P.3d 507, 513-14 (Utah 2005) (warrants check within permissible scope of justified detention of pedestrian can quickly provide highly relevant information that serves to either heighten or alleviate the suspicion that originally justified the check and can also prove invaluable to officer safety). Contra, *United States v. Luckett*, 484 F.2d 89, 90-91 (9th Cir. 1973) (holding jaywalker for warrant check unreasonable without reason to suspect there may be outstanding warrant).

While these cases are of some utility, we note that they all predate the United States Supreme Court's decision in *Arizona v. Johnson*, 555 U.S. 323, 129 S. Ct. 781, 172 L. Ed. 2d 694 (2009). We included *Johnson* in our analysis in *State v. Morlock*, 289 Kan. 980, 218 P.3d 801 (2009). There, we expressly approved law enforcement's running of a records check on a vehicle passenger when reasonable suspicion existed for him independent of the initial reason for the legitimate traffic stop. We have not yet expressly approved such checks, as here, on *pedestrians* stopped by police

for which reasonable suspicion exists. We find *Morlock* and *Johnson* of guidance on this issue.

As the *Morlock* court observed, *Johnson* permitted an officer, in the context of traffic stops, to inquire into passenger "matters unrelated to the justification for the . . . stop," *i.e.*, without reasonable suspicion, " 'so long as those inquiries do not measurably extend the duration of the stop.' " 289 Kan. at 987 (quoting *Johnson*, 129 S. Ct. at 788). *Johnson* relied upon *Muehler v. Mena*, 544 U.S. 93, 125 S. Ct. 1465, 161 L. Ed. 2d 299 (2005).

*Muehler*, in turn, relied upon *Illinois v. Caballes*, 543 U.S. 405, 125 S. Ct. 834, 160 L. Ed. 2d 842 (2005), which held that, without more, a drug dog sniff performed during a lawfully commenced traffic stop did not violate the Fourth Amendment. The *Muehler* court essentially held that law enforcement officers could ask questions unrelated to the purpose of executing a residential search warrant—without reasonable suspicion—as long as the questions did not prolong the search:

> "Because we held [in *Caballes*] that a dog sniff was not a search subject to the Fourth Amendment, *we rejected the notion that 'the shift in purpose'* . . . was unlawful because it 'was not supported by a reasonable suspicion.' *Id.* at 408." (Emphasis added.) *Muehler*, 544 U.S. at 101.

Using this Supreme Court framework, we determined in *Morlock* that certain questions asked of the passenger did not exceed the traffic stop's constitutionally permissible boundaries. More important to the instant case, we also determined that the deputy sheriff's taking passenger Morlock's driver's license to his patrol vehicle and using it to run a warrants check on the vehicle computer was likewise constitutionally permissible. We specifically held that the computer check was warranted by the deputy's reasonable suspicion of passenger Morlock based upon Morlock's own conduct and verbal responses. 289 Kan. at 995-99.

In the instant case, we previously concluded as a matter of law that under the totality of the circumstances, Officer Pittman had reasonable suspicion to detain and investigate pedestrian Walker for allegedly breaking Torono's truck window and stealing a CD case. Based upon *Morlock* and the United States Supreme Court

authority it cites, we likewise readily conclude Pittman did not exceed the detention's constitutionally permissible boundaries by taking Walker's ID and using it to run a computer records check.

Walker disputes the sequence of these events, *e.g.*, he claims he was arrested and his backpack was searched before Pittman ran the records check. However, the district judge's sequential findings indicate he believed Pittman: "he [defendant] gave him some sort of Missouri identification card. At that point, the officer found out there was an active arrest warrant for the defendant. At that point in time, the arrest was legal . . . ."

The court's findings are supported by substantial competent evidence. *State v. Thomas*, 291 Kan. 676, 246 P.3d 678 (2011). We do not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. We also accept as true all inferences to be drawn from the evidence which support or tend to support the findings of the district court. *U.S.D. No. 233 v. Kansas Ass'n of American Educators*, 275 Kan. 313, 320, 64 P.3d 372 (2003).

In light of our ruling, we need not reach the final issue raised in the briefs: whether Pittman's discovery of the outstanding arrest warrant precludes application of the exclusionary rule.

Affirmed.

PAUL E. MILLER, District Judge, assigned.