(182 P.3d 1)
No. 98,725
98,726

STATE OF KANSAS, *Appellant*, v. GEORGE T. MELL, *Appellee*.

STATE OF KANSAS, *Appellant*, v. NANCY M. MELL, *Appellee*.

Opinion filed April 18, 2008.

*Stephen A. Hunting,* deputy county attorney, and *Paul J. Morrison,* attorney general, for appellant.

*William K. Rork, Wendie C. Bryan,* and *Kenneth B. Miller,* of Rork Law Office, of Topeka, for appellee George T. Mell.

*Kathleen Neff,* of DeVoe & Neff, Lawyers, of Overbrook, for appellee Nancy M. Mell.

Before GREEN, P.J., GREENE and LEBEN, JJ.

GREEN, J.: In a prosecution for cultivation of marijuana, possession of methamphetamine, possession of marijuana, no drug tax stamp, and possession of drug paraphernalia, the State appeals from a pretrial order suppressing evidence obtained in a search of the residence of Nancy M. Mell and George T. Mell. On appeal, the State contends that the trial court erred in determining that the area in the yard where marijuana plants were growing was within the curtilage of the residence. We agree and reverse. Next, the State contends that the trial court improperly determined that a police officer's warrantless entry into the Mells' residence was not justified by exigent circumstances. We disagree and affirm. Finally, the State asserts that the affidavit for the search warrant

furnished the magistrate with sufficient facts from which the magistrate could conclude that probable cause existed to believe the Mells' residence had some nexus with the growing of marijuana plants. We disagree and affirm. Accordingly, we affirm in part, reverse in part, and remand for trial without the evidence seized in the search of the Mells' residence.

On June 14, 2006, Officer Richard Howard went to the Mells' residence to serve a warrant for a probation violation on their daughter, Kayla Mell. Several cars were parked at the residence. Howard was met at the front door by Nancy, who stepped out onto the front porch. Howard did not enter the house. Howard told Nancy that he was looking for Kayla. Nancy told Howard that Kayla was not home. Although Howard attempted to leave, Nancy continued to engage Howard in conversation about Kayla as he walked to the sidewalk where his patrol car was parked.

As Howard stood on the sidewalk between the Mells' house and the neighboring house, he looked towards the backyard for no particular reason. Nancy, who was still standing on the porch and unable to view the backyard from her vantage point, noticed Howard looking in that direction. Nancy pointed towards the backyard and asked, " 'Are those what I think they are?' " Howard responded, " 'What's that?' " Nancy answered, " 'The weeds back there.' " Howard responded, " 'What weeds?' " Nancy replied, " 'The ones by the fence. . . . Are they what I think they are?' " Howard could see weeds by the fence but could not identify them from his location. Howard had not noticed the plants before this inquiry by Nancy. Howard responded, " 'I don't know,' " and, without Nancy asking him to do so, walked towards the backyard to see what Nancy was talking about.

When Howard arrived at the area in question, he noticed what appeared to be eight or nine marijuana plants located in the side yard. Before reaching the area where the plants were located, Howard could only identify the plants as "weeds." He did not identify them as marijuana until he walked into the side yard and viewed the plants up close. The record does not reflect the distance between the sidewalk where Howard was initially located and the plants.

The plants were mixed in with other weeds, and there was straw placed around them. Although Howard testified that there was no straw in the backyard except in this particular spot, he later admitted that straw was in the front yard by the sidewalk and porch where the Mells were trying to grow grass. Photos of the scene showed that a large portion of the front and side yard was covered with straw. Although the rest of the Mells' backyard was fenced in, the area where the plants were located was outside this fence and was not gated or fenced in. Howard did not enter the fenced area, as the plants were located in front of the fence. No warning signs were present. No objects were located between the view of the area from the front yard and the plants themselves. The area was located not far from the back door of the Mells' house, on the Mells' side of the yard between their adjoining neighbor's house.

After observing what he believed to be marijuana plants, Howard told Nancy that he was going to have the drug unit come out to look at the plants. Nancy explained that her husband was going to mow them down when he got off work and asked Howard to pull them up.

Detective Aaron Procaccini, a member of the drug unit, later arrived on the scene to look at the plants. Procaccini first talked to Howard and then walked back to the area where the plants were located. Procaccini observed 11 plants he believed to be marijuana. The record fails to state when Procaccini first observed and identified the plants as marijuana. Nancy explained that her husband had recently planted grass in that area of the yard and speculated that marijuana seeds may have been in the grass seed. Procaccini also noticed straw on the ground around the plants.

Based on this observation, Procaccini decided to apply for a search warrant for the Mells' residence. Procaccini felt there may have been chemicals to grow marijuana or marijuana itself inside the house. Nancy refused to allow Procaccini to enter the residence. Procaccini was aware that Nancy, George, and Kayla lived at the residence but was unsure if any other people were inside the house. Procaccini believed that any evidence inside the residence could be destroyed if someone was inside and the residence was not secured. Although Nancy indicated to Procaccini that no

one else was inside the house, Procaccini proceeded to enter the residence.

Upon entering the home, Procaccini immediately detected the odor of burning marijuana. Procaccini also discovered several items of drug paraphernalia in plain view. Nevertheless, Procaccini testified that his purpose for entering the home was to look for people, not items. No persons were discovered within the residence. Procaccini, however, obtained a search warrant based on the previously mentioned facts.

As a result of a search of the home under the search warrant, drugs and drug paraphernalia were obtained from the Mells' residence. In addition, the marijuana plants discovered in the yard were seized. George and Nancy were ultimately charged with cultivation of marijuana, possession of methamphetamine, possession of marijuana, no drug tax stamp, and possession of drug paraphernalia. The Mells moved to suppress the evidence obtained as a result of the search. They argued that no probable cause existed for issuance of the search warrant, that no exigent circumstances existed to permit the initial search without a warrant, and that the officers unlawfully intruded upon the Mells' reasonable expectation of privacy by entering the curtilage of their home without permission to view the plants.

The trial court granted the motion to suppress. First, the court determined that, contrary to the assertion of Procaccini in his affidavit, Howard did not identify the plants as marijuana but only as weeds when he first observed them from the sidewalk. Furthermore, the court held that the plants were located within the curtilage of the home and that Howard exceeded the scope of a lawful intrusion by entering this area to observe them without permission. Moreover, the court determined that Howard did not identify the plants as marijuana until after this unlawful intrusion. As a result, the trial court excised paragraph 2 of the affidavit, which discussed Howard locating marijuana plants in the Mells' yard.

The trial court next held that there were no exigent circumstances to support the initial warrantless search of the home. For

this reason, the court excised paragraph 5 of the affidavit, which discussed the evidence discovered as a result of this search.

After excising paragraphs 2 and 5 of the affidavit, the trial court held that the magistrate would not have had a substantial basis for determining that probable cause existed to support the issuance of a search warrant. For this reason, the court granted the motion to suppress all items discovered as a result of the search made without a warrant and obtained from the search made with a warrant.

## I. *Did the Trial Court Err in Finding the Area at Issue Was Within the Curtilage of the Home?*

In granting the motion to suppress, the trial court found that the area of the Mells' yard where the marijuana plants were located was within the curtilage of the home. On appeal, the State argues this area was not within the curtilage. As a result, the State maintains that the officer was in a lawful position to view the plants and the trial court incorrectly excised paragraph 2 of the affidavit. When the State alleges an area is not within the curtilage, it has the burden of proving that point. *State v. Fisher*, 283 Kan. 272, 284, 154 P.3d 455 (2007). The question of curtilage is a mixed question of fact and law. We review a trial court's factual findings for substantial competent evidence and review de novo its legal conclusion whether a particular seizure occurred within the curtilage. 283 Kan. at 286.

When determining whether a particular area is deemed within the curtilage of a home, courts look to four factors: (1) the proximity of the area to the home, (2) whether the area is included within an enclosure surrounding the home, (3) the nature of the uses to which the area is put, and (4) the steps taken by the resident to protect the area from observation by people passing by 283 Kan. at 286 (citing *United States v. Dunn*, 480 U.S. 294, 301, 94 L. Ed. 2d 326, 107 S. Ct. 1134, *reh. denied* 481 U.S. 1024 [1987]). These factors are not to be mechanically applied, but are useful analytical tools to the degree that they bear upon the centrally relevant consideration: whether the area is so intimately tied to the home itself that it should be placed under the umbrella of the Fourth Amendment to the United States Constitution protection. 480 U.S. at 301.

The extent of the curtilage is determined by factors that bear upon whether an individual may reasonably expect that the area in question be treated as the home itself. 480 U.S. at 300.

Turning to the first factor, we note that the State concedes that the proximity of the area in question to the Mells' home supports a finding of curtilage. There is no fixed distance at which curtilage ends. See *Fisher*, 283 Kan. at 287-88 (finding object located approximately 50 yards from the residence is within the curtilage of the home). Indeed, a photo of the scene demonstrated that the area in question was located not far from the back door of the Mells' residence. Thus, the first factor—the proximity of the area in question to the Mells' home—favors the Mells.

As to the second factor, the State argues that the area in question is not within an enclosure surrounding the home and is therefore outside the curtilage. The State points out that the area is observable from the public sidewalk, no objects exist between the area and the public sidewalk, no fences or warning signs are placed around the area, and the area is outside the enclosed fence. On the other hand, the trial court held that under *Fisher*, another house, such as the neighboring house in this case, can create an enclosure. The State argues the trial court's reasoning that the neighboring house creates an enclosure renders this factor useless in an urban setting.

It must first be mentioned that some courts do consider whether the area is in a rural or urban setting when analyzing this factor. See *United States v. Acosta*, 965 F.2d 1248, 1256 (3d Cir. 1992) (noting that although the *Dunn* factors apply to extent-of-curtilage questions in urban areas, certain factors may be less determinative in a city setting because of the physical differences in the properties, citing *Horton v. United States*, 541 A.2d 604 [D.C. 1988] [determination will necessarily center on use made of area since fencing will be less significant than in rural area and it may be impossible to shield the area from observation]).

In *Fisher*, the court held that an enclosure was created when the area in question was part of the yard, which was surrounded by a highway and a barbed wire fence, citing a Sixth Circuit Court of Appeals case that found significant the fact that the house and

yard were within the same fenced area. 283 Kan. at 289; see *United States v. Jenkins*, 124 F.3d 768, 773 (6th Cir. 1997). *Fisher* does not state that a neighboring house creates an enclosure, as the trial court in the present case suggests, but instead focuses on whether a fence is present and where it is located. 283 Kan. at 289; see also *State v. Tinsley*, 16 Kan. App. 2d 287, 292, 823 P.2d 205 (1991) (commenting on lack of fence or other enclosure surrounding the home when holding area outside curtilage); *State v. Waldschmidt*, 12 Kan. App. 2d 284, 290-91, 740 P.2d 617, *rev. denied* 242 Kan. 905 (1987) (emphasizing yard was enclosed by fence when holding area within the curtilage).

Here, the area in question was not enclosed by a fence and was outside the area of the yard that was enclosed by a fence. See *Dunn*, 480 U.S. at 302 (finding significant that respondent's barn did not lie within the area surrounding the house that was enclosed by a fence). Furthermore, photos of the scene showed that the area was overgrown with plants and other weeds and had not been mowed regularly or well-maintained. See *Fisher*, 283 Kan. at 289 (emphasizing that the area within the fence was mowed and maintained by the owner). The area and plants could be observed by persons standing on the public sidewalk; yet, the area was partially enclosed by the Mells' house, the neighboring house, and the fence. Moreover, no sidewalk led to the open side of the area. *Cf. United States v. Cousins*, 455 F.3d 1116, 1122 (10th Cir. 2006), *cert. denied* 166 L. Ed. 2d 115 (2006) (holding the wall of the house, a gate door, and a fence suffice to create a partial enclosure, but sidewalk on unenclosed area weighs against finding of curtilage). Nevertheless, the open view of the plants and the lack of their enclosure within the existing fenced area weighs against the plants being included within the enclosure that surrounds the house. As a result, the second factor—whether the area is within an enclosure—weighs in favor of finding that the officers were not within the curtilage of the Mells' home.

Third, the State argues that the area cannot be considered curtilage because the nature of its use is not one associated with an intimate activity of the home, such as gardening, but is merely part

of the lawn. In contrast, the trial court found that the area in question was part of the lawn or, alternatively, part of the garden.

The court in *Fisher* emphasized the use of the area in question for gardening purposes in holding the area was within the curtilage. 283 Kan. at 289. Contrary to the trial court's finding in the present case, there was no evidence in the record that the area in question was used for gardening purposes. The record did, however, show that straw was placed around the plants and over a great portion of the yard, indicating the Mells were trying to grow grass for the lawn. This suggests that the area was being used for purposes associated with an activity of the home: namely, growing and keeping a lawn. On the other hand, the Mells did not point to a particular use or activity attributed to the area in question, and photos of the area indicated that the plants were overgrown among weeds. See *Tinsley*, 16 Kan. App. 2d at 292 (holding area not within curtilage when defendant failed to show he was utilizing the area in question); *Cousins*, 455 F.3d at 1122-23 (holding that planting a few melons does not add significantly to a finding of curtilage when other factors outweigh this conclusion).

The State cites *Cousins*, arguing that the presence of a central air conditioning unit within the area in question negates any claim the yard was being used for private purposes. Nevertheless, *Cousins* did not deal with an air conditioning unit but with an electric meter located in a sidewalked area where utility employees frequented. See 455 F.3d at 1123. Although an air conditioner unit existed within the area in question in the present case, there was no evidence that persons would frequent the area due to its presence and there was no sidewalk leading to the unit.

In sum, the third factor—uses to which the area is put—weakly favors the Mells. The straw around the plants, indicating lawn activity was taking place in the area, and the lack of sidewalk weighs in favor of finding curtilage. In contrast, the overgrowth and lack of evidence of gardening or any other specific use of the area weighs against this conclusion.

Fourth, the State contends that the Mells took no affirmative steps to protect the area from observation by persons passing by. The State points out that the area was not visually blocked from

the sidewalk, that there was no fence or enclosure, that the area was observable by the neighbors, that the purpose of the straw was not concealment but to aid in grass growth, and that it was Nancy who pointed out the area to Howard. The trial court, however, held that the interspersing of the plants with grass and the placement of straw throughout the lawn constituted steps taken to protect the area from observation.

In *Fisher*, the court held that the area in question was within the curtilage of the home when the evidence was blocked from sight by the house and would only have been observable from certain areas. 283 Kan. at 289-90. The *Fisher* court noted that the presence of a "No Trespassing" sign and the remoteness of the house's location were factors to consider. In the present case, the area where the plants were located was not gated or fenced in, no warning signs were present, no objects were located between the frontal view of the area and the plants themselves, and the house was located in a residential area within approximately 20 feet of the neighbor's home. It seems unlikely that the Mells used straw to protect the plants or any other portion of their yard from observation, but likely they used it merely to aid in grass growth. In its appellate brief, the State points out that "[the straw's] purpose was to aid in the growth of a new stand of grass and not concealment. . . . The Mell[s] took no measures to hide the area where the marijuana plants were located." A photo of the area in question reveals that the straw was placed on the ground. The straw did not cover the plants. Moreover, the straw did not prevent view of the plants in any way.

Although Howard testified that he could not identify the plants as marijuana from his vantage point on the sidewalk, he stated he could see the plants. This does not foreclose the possibility that another reasonable person could have observed and identified the plants. The proper inquiry deals with whether the resident took affirmative steps to protect the object. Here, Nancy drew attention to the area when she turned to the officer and asked, "Are those what I think they are?" When the officer started to walk in the direction to where Nancy was looking, Nancy did not tell him to stop. Nancy's actions suggested that she invited an inspection of

the area. Thus, the final factor, whether steps have been taken to protect the area from observation by people passing by, also weighs in favor of finding that the officers did not enter the curtilage of the Mells' home.

Given that the Mells took no affirmative steps to protect the area and to prevent entry into the area, we determine that they had no reasonable expectation of privacy regarding the spot from which the officers viewed the marijuana plants. Moreover, having located the plants from outside the curtilage of the home, the officers then were able to view the plants when they returned to a public sidewalk.

## II. *Did the Trial Court Err in Finding No Exigent Circumstances Justified the Warrantless Entry into the Home?*

The trial court held that exigent circumstances did not exist to justify Procaccini's warrantless entry into the Mells' home. Based in part on this finding, the court granted the Mells' motion to suppress the evidence obtained as a result of the search.

" ' "When analyzing a district court's suppression of evidence, an appellate court reviews the factual underpinnings of a district court's decision by a substantial competent evidence standard and the ultimate legal conclusion drawn from those facts by a de novo standard. An appellate court does not reweigh the evidence. The ultimate determination of the suppression of evidence is a legal question requiring independent appellate review." ' " *State v. Huff*, 278 Kan. 214, 219, 92 P.3d 604 (2004) (quoting *State v. Pritchett*, 270 Kan. 125, 128, 11 P.3d 1125 [2000]).

Warrantless searches are per se unreasonable under the Fourth Amendment to the United States Constitution, subject to a few specifically established exceptions. *State v. Platten*, 225 Kan. 764, 769, 594 P.2d 201 (1979). One such exception is where there is probable cause for the search and exigent circumstances justify an immediate search. *State v. Weas*, 26 Kan. App. 2d 598, 600, 992 P.2d 221 (1999), *rev. denied* 268 Kan. 895 (2000). Probable cause alone is insufficient to justify a warrantless entry into a private residence; it is also necessary for the officer to show exigent circumstances which make an immediate warrantless search imperative. *Monroe v. Darr*, 221 Kan. 281, 287, 559 P.2d 322 (1977).

The burden of proving the lawfulness of a search is on the State. *State v. Boyd*, 275 Kan. 271, 273, 64 P.3d 419 (2003).

First, a real question exists whether there was probable cause in this case. Probable cause for a search requires the presence of information which would lead a reasonably prudent person to believe that a crime has been or is being committed and that evidence of the crime may be found on a particular person, in a specific place, or within a specific means of conveyance. *State v. Mayberry*, 248 Kan. 369, 377, 807 P.2d 86 (1991). In this case, no nexus was shown between the marijuana plants and the Mells' residence. Indeed, as we will discuss in the next issue, there was no evidence that the Mells' residence was used for criminal activity.

Turning to an examination of the exigent circumstances doctrine, we note that courts often use a nonexclusive list of factors to determine whether exigent circumstances exist to make a warrantless search: (1) the gravity or violent nature of the offense to be charged; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause; (4) strong reasons to believe the suspect is in the premises; (5) a likelihood that the suspect will escape if not swiftly apprehended; (6) the peaceful circumstances of the entry; and (7) the possible loss or destruction of evidence. *Platten*, 225 Kan. at 770. Exigent circumstances exist when the officer reasonably believes there is a threat of imminent loss, destruction, removal, or concealment of evidence or contraband. *State v. Houze*, 23 Kan. App. 2d 336, 337, 930 P.2d 620, *rev. denied* 261 Kan. 1088 (1997). Exigent circumstances do not include situations where only a mere possibility exists that evidence could be destroyed or concealed. *State v. Hardyway*, 264 Kan. 451, 465, 958 P.2d 618 (1998). Whether exigent circumstances exist to justify the warrantless search of a home is dependent upon the particular facts and circumstances of the situation. *State v. Gilbert*, 24 Kan. App. 2d 159, 168, 942 P.2d 660, *rev. denied* 262 Kan. 965 (1997).

*Platten* held that exigent circumstances did not exist when officers *knew* the suspect was located within his home in possession of drugs and could have easily destroyed that evidence, ruling that a warrant was nevertheless necessary. 225 Kan. at 769-71. In *State v. Shur*, 217 Kan. 741, 745-46, 538 P.2d 689 (1975), the court held

that absent a showing of circumstances indicating the likely destruction of evidence, the observation of a rolled cigarette in plain view and the detection of the odor of burning marijuana would not authorize a search of the premises without a valid warrant or consent. Furthermore, the court in *Huff* held that exigent circumstances did not exist when the suspected crime was nonviolent (the officer only detected the smell of marijuana) and there was no indication any of the occupants of the home were armed or likely to escape. 278 Kan. at 220-21. The officer testified he believed it was necessary to secure the residence to prevent destruction of evidence, but he lacked any objective evidence that the apartment was inhabited by anyone other than the person who answered the door. 278 Kan. at 216, 221.

In contrast, in *State v. Cabral*, No. 96,379, an unpublished opinion filed June 15, 2007, slip op. at 8-9, a panel of this court held that exigent circumstances did not exist under facts similar to those in *Huff*, even though the officer knew there were several unidentified persons present in the home and these persons were likely aware of the officer's presence. The court noted that the officer expressed no concern that the occupants would destroy evidence, but instead stated he was " 'looking for people and not evidence.' " Slip op. at 9.

Turning to the nonexclusive list of factors, we note that the first factor—the gravity or violent nature of the offense—is unsupported. There was no evidence in the record that the police would have been endangered if they had not entered the residence promptly. The suspected crime was nonviolent, as the officers had merely observed marijuana plants growing in the Mells' yard. Moreover, when the officer entered the home, there was no evidence anybody else in the residence was armed or presented a danger to the officers. Contrast *State v. Tolson*, 274 Kan. 558, 570-71, 56 P.3d 279 (2002) (upholding warrantless entry when crime was a violent shooting, suspect was armed and in the house, victim's life was in danger, and known occupants had reasonable opportunity to destroy evidence).

Further, the second factor—whether the suspect is reasonably believed to be armed—is also unsupported. There was no evidence

that Nancy or any other occupants were potentially armed or would attempt to escape the scene. Moreover, Nancy's freedom of movement had not been limited; she was not placed in handcuffs; and Howard's weapon was not drawn. These facts indicate that the situation was peaceful and under control. Although the State points out that Nancy refused to allow the officers to enter her home, the refusal by a suspect of permission to enter his or her home cannot properly be considered as a factor creating exigent circumstances. *Schur*, 217 Kan. at 745.

The third factor requires a clear showing of probable cause. Nevertheless, the officer's belief that evidence of a crime was actually within the home was based on mere speculation, as he only observed marijuana plants growing in the yard and had no actual knowledge that evidence existed inside the home, as in *Platten*. See 225 Kan. at 765-66.

The fourth factor—strong reasons to believe a subject is in the premises—is unsupported by the facts. Procaccini testified that he believed persons may have been inside the residence and felt evidence could potentially be destroyed. Nevertheless, Nancy told Procaccini that no one was inside the home, and Procacinni had no independent knowledge that anybody else was inside the home. As in *Cabral*, Procaccini testified that he was looking for people, not evidence.

The fifth factor—a likelihood that a suspect will escape if not swiftly apprehended—is not supported. Nancy was outside her home, standing by the officers. Moreover, the officers could have easily secured the perimeter of the house while they obtained a search warrant if they believed other suspects were inside the house.

The sixth factor—the peaceful circumstances of the entry—is supported. Finally, the seventh factor—the possible loss or destruction of the evidence—is not supported based on the information known by the officers. Nothing in the information known by the officers before Procaccini's entry into the home necessarily indicated that there would be evidence of drugs in the residence. Further, there was no evidence that if Procaccini had not entered the residence immediately, evidence could have been destroyed or

hidden from investigation. Moreover, exigent circumstances do not include situations where only a mere possibility exists that evidence could be destroyed or concealed. *Hardway*, 264 Kan. at 465.

It follows that substantial competent evidence exists that Procaccini's warrantless entry into the Mells' residence was not justified by exigent circumstances. Moreover, much of the information furnished in the warrant affidavit regarding the drug charges was not obtained until after entry had been made. As a result, the trial court properly excised paragraph 5 from the search warrant affidavit.

III. *Did the Affidavit Provide the Magistrate Judge Issuing the Warrant with a Substantial Basis for Determining That Probable Cause Existed?*

"[T]he specific, narrower question within the district court's general determination of suppression—a magistrate judge's finding of probable cause to issue a search warrant—is reviewed under a different standard. [Citations omitted.] As this court held in *State v. Hicks*, 282 Kan. 599, Syl. ¶ 2, 147 P.3d 1076 (2006), the correct standard of review is instead more deferential to the magistrate judge. The deference is owed by all reviewing courts, district and appellate. More specifically, the standard is whether the evidence provided the magistrate issuing the search warrant with a substantial basis for determining that probable cause existed." *State v. Fisher*, 283 Kan. 272, 300, 154 P.3d 455 (2007).

Kansas applies this deferential standard when examining an excised affidavit that had been considered in its complete form by a magistrate before issuing a search warrant, as occurred in the present case. 283 Kan. at 303. In announcing its ruling on the motion to suppress, the trial court recognized this deferential standard that it was required to apply:

"The standard of review in determining a motion to suppress evidence in reviewing a magistrate judge finding of probable cause is reviewed under a more deferential standard than ordinarily analyzing probable cause. This deference is owed by all reviewing courts, district and appellate. More specifically, the standard is whether the evidence provided the magistrate issuing the search warrant with a substantial basis for determining that probable cause existed."

The trial court noted that the issuing magistrate in this case was Judge Stephen Jones, "an experienced 30 plus years knowledgeable lawyer and a well-respected jurist." Nevertheless, the trial court

found that the magistrate had been "misled in his decision because of the fact that information contained in the affidavit for search warrant . . . was erroneous and misleading . . . ." The trial court determined that part of the information in the affidavit "needs to be excised due to my findings in this case." Granting the motion to suppress in the case at hand, the trial court held there was not a substantial basis for determining that probable cause existed for the issuance of a search warrant. The court reached this conclusion after excising paragraphs 2 and 5 from the affidavit supporting the search warrant.

Based on reasoning set forth in the previous sections, paragraph 5 of the affidavit was properly excised, while paragraph 2 was improperly removed. See *Fisher*, 283 Kan. at 304-09 (examining the totality of the circumstances, based on the legally obtained evidence in the affidavit for search warrant, to determine whether a substantial basis for probable cause existed). Thus, the fact that Howard observed marijuana plants in the Mells' yard, a fact actually set forth in unexcised paragraph 3 of the affidavit, was appropriately considered by the magistrate when issuing the search warrant.

"The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed. [Citation omitted.]" *Illinois v. Gates*, 462 U.S. 213, 238-39, 76 L. Ed. 2d 527, 103 S. Ct. 2317, *reh. denied* 463 U.S. 1237 (1983).

The State contends that the location of the plants, that the number of plants (approximately 11), that the behavior of Nancy, and that the story offered by Nancy, taken together, were sufficient enough to establish probable cause to believe that drugs or illegal contraband existed inside the residence. Nevertheless, the trial court determined that once paragraph 5, which covered the results of Procaccini's illegal entry into the house, and paragraph 2 were excised, the remaining facts were insufficient to establish that probable cause existed for issuance of a warrant to search the Mells'

home. As a result, the question presented is whether there is a sufficient nexus between the marijuana plants and the Mells' house to support the issuance of a search warrant.

We now proceed to evaluate whether the redacted affidavit established probable cause to support the search warrant. In *State v. Jacob*, 8 Kan. App. 2d 729, 731, 667 P.2d 397 (1983), this court warned an issuing magistrate about marijuana in this state: "The mere presence of marijuana does not imply the marijuana was cultivated or that any of it had been harvested. [Citation omitted.]" In *State v. Brown*, 2 Kan. App. 2d 379, 380-81, 579 P.2d 729 (1978), this court took judicial notice of the fact that marijuana grows wild throughout most of Kansas. Thus, the presence of marijuana plants on a person's land does not show that harvested marijuana will be found in buildings on the person's land. 2 Kan. App. 2d at 380-81. In the present case, no evidence was presented that the Mells cultivated or harvested the marijuana plants.

Indeed, the affidavit here fails. It sets forth no evidence that the Mells' residence was being used for criminal activity, nor does the affidavit show a nexus between the marijuana plant area and the Mells' residence. There is, for example, no evidence that the lawn around the marijuana plant area was being regularly mowed. To the contrary, the pictures in the record show that the area was overgrown with weeds. Moreover, there is no allegation that anyone had ever observed the Mells approach or pause in that particular area. Further, the affidavit sets forth no evidence that the Mells cultivated, watered, tended to, or exercised any dominion or control over the marijuana plants.

A. *Material Omissions From the Affidavit*

The affidavit supporting a search warrant is presumed valid. Nevertheless, if a defendant is able to make a "substantial preliminary showing" that "a false statement is included in the affidavit," the false statement was made "knowingly and intentionally or with reckless disregard for the truth," and the false statement "was necessary to the finding of probable cause," the defendant is entitled to a hearing. *Franks v. Delaware*, 438 U.S. 154, 155-56, 57 L. Ed. 2d 667, 98 S. Ct. 2674 (1978). Moreover, "[t]he same rule applies

to a deliberate omission of material information." *State v. Hendricks,* 31 Kan. App. 2d 138, 141, 61 P.3d 722 (2003) (*citing State v. Bowen,* 27 Kan. App. 2d 122, 131-32, 999 P.2d 286 [2000]); see *State v. Grissom,* 251 Kan. 851, 907, 840 P.2d 1142 (1992).

When the trial court conducts a hearing and the defendant establishes by a preponderance of the evidence the allegation that a statement in the warrant affidavit is knowingly and intentionally false or made in reckless disregard of the truth, the statements will be removed from the affidavit and a determination made as to whether the affidavit's remaining content is sufficient to establish probable cause. *Franks,* 438 U.S. at 155-56. Similarly, when the defendant establishes that there has been a deliberate omission of material information from the warrant affidavit, the trial court then determines whether there would have been probable cause to issue the warrant had the magistrate been aware of the omitted information. *Hendricks,* 31 Kan. App. 2d at 142.

The Mells requested and were granted a *Franks* hearing. The affidavit for the search warrant contained the following statement of Procaccini: "Affiant . . . noticed straw on the ground in the area the plants were growing, but no where else on that side of the house." At the *Franks* hearing, Officer Howard's testimony showed that Procaccini had failed to mention in the affidavit that there was straw all over the Mells' yard. Although the trial court did not excise this statement from the affidavit, the trial judge made this specific finding:

"I think it's also important on this issue to mention another fact that I had not mentioned up to now that Miss Neff brought out in her cross-examination, that there was evidence that there was straw throughout the lawn . . ., straw in the back, straw in the front, and all of this straw would be in the nature of what you put down to try to get a new stand of grass, and that was throughout."

After the *Franks* hearing, the trial court determined that the facts supporting the issuance of the search warrant were insufficient to show probable cause. By leaving out the fact that the Mells had scattered straw all over their yard, this would have allowed the magistrate to improperly infer that the Mells had been cultivating the marijuana plants because they had strewn straw only around the marijuana plants. Moreover, conceding that the affidavit as

worded would have allowed the magistrate to infer that the Mells were cultivating the marijuana plants, the dissent states: "The placement of straw specifically around the marijuana plants—but not in any immediately adjacent area—raises the inference of cultivation activity there." 39 Kan. App. 2d at 510.

It follows that this deliberate and material omission from the affidavit that the straw had been strewn all over the yard severely distorted the facts relevant to the following: whether the marijuana plants had been simply growing wild or whether the marijuana plants had been cultivated or tended to by the Mells. Indeed, Procaccini's failure to include in the affidavit information about the straw being strewn all over the yard and that the marijuana plants were growing among other weeds in an untended area of the yard amounted to excluding exculpatory information from the affidavit. "[A] deliberate omission is often equal to an actual misstatement. Thus, the [*State v.*] *Jacques* [225 Kan. 38, 587 P.2d 861 (1978),] and *Franks* rules can easily apply to a case where a person claims authorities deliberately omitted material information from a search warrant." *State v. Lockett*, 232 Kan. 317, 319, 654 P.2d 433 (1982). Based on this deliberate and material omission by Procaccini, we determine that this statement about the straw should have been excised from the affidavit because it gave a false implication that the Mells were cultivating and tending to the marijuana plants.

Nevertheless, the dissent argues that an appellate court "may not step in and find that Detective Procaccini deliberately misled the magistrate by omitting information about straw in other areas of the yard when the district court did not strike that paragraph from the affidavit." 39 Kan. App. 2d at 509. Consequently, the dissent maintains that because the trial court failed to excise Procaccini's statement from the affidavit, the Mells and this court are saddled with it. The dissent's assertion is not warranted for two reasons—one based on our standard of review and one based on the record.

First, as we previously pointed out, the trial court made findings that the evidence showed "that there was straw throughout the lawn . . ., straw in the back, straw in the front, and all of this straw would be in the nature of what you put down to try to get a new

stand of grass, and that was throughout." Moreover, these findings were supported by Howard's testimony and the pictures in the appellate record of the area surrounding the Mells' residence. Finally, the State concedes in its brief that straw had been strewn throughout the yard: "[T]he straw was spread throughout the Mells' entire yard." Upon appellate review, we must accept as true the evidence and all inferences to be drawn therefrom to support the trial court's findings and disregard any conflicting evidence or other inferences that might be drawn from the evidence. *State v. Orr*, 262 Kan. 312, 322, 940 P.2d 42 (1997). We do not reweigh the evidence or pass upon the credibility of witnesses. *State v. Washington*, 275 Kan. 644, 669, 68 P.3d 134 (2003).

Consequently, the trial court's findings that there was straw strewn throughout the entire yard of the Mells' residence were supported by evidence in the record and must be accepted as true. These findings directly contradict the implication from Procaccini's statement in the search warrant affidavit that the Mells were cultivating and tending to the marijuana plants. Therefore, contrary to the dissent's position, our standard of review will not allow us to accept the statement in the search warrant affidavit on this point.

Nevertheless, the dissent states that the trial judge did not make his statement concerning the straw as part of any finding that the affidavit was materially false or misleading. Therefore, according to the dissent, the trial court's findings concerning the straw cannot be used to determine whether certain information should have been excised from the affidavit. The dissent takes a myopic view of the trial court's findings. K.S.A. 60-252 requires the trial judge to "find, and either orally or in writing state, the controlling facts . . . ." Moreover, Supreme Court Rule 165 (2007 Kan. Ct. R. Annot. 231) requires the trial judge to "state the controlling facts required by K.S.A. 60-252." Neither K.S.A. 60-252 nor Rule 165 require a judge to state all new factual findings each time the trial judge considers a different but related issue in a motion to suppress. Nevertheless, if we were to adopt the dissent's position, the trial judge not only would be required to state the controlling facts but also would be required to state a new set of controlling facts each time the trial judge decided another issue in a matter

even if the issue was related to a previous issue decided by the trial judge. Fortunately, K.S.A. 60-252 and Rule 165 impose no such burden on a trial judge.

Indeed, this court has previously commented on the burdens of a trial judge:

"Our trial courts are extremely busy and there is no relief in sight. The work load in trial courts in all probability will continue to increase, and judicial time will become even more precious to an already overextended trial bench. . . . In nearly all cases, the findings of fact give the parties adequate insight into how a decision is arrived at. Appellate judges, however, prefer surgically clean findings that remove all doubt on any issue raised by enterprising counsel. The problem is that this court (and, to some extent, trial counsel) deals in hindsight on appeals, whereas the trial court must deal with reality; the trial judge rarely suspects that the decision will be appealed, and, if so, what issues will be raised. As a result, the findings frequently do not cover the issues raised on appeal to the extent we would like. Trial judges do not have time available to make findings concerning every conceivable issue, and to force them to do so in every case would not only halt the exemplary record they have achieved but also force them to considerably reduce their present output." *In re Lett & Jackson*, 7 Kan. App. 2d 329, 336, 640 P.2d 1294, *rev. denied* 231 Kan. 800 (1982).

Our Supreme Court has held that the requirements of K.S.A. 60-252(a) are fulfilled if the trial court's findings resolve the issues presented to the court and adequately advise the parties and the appellate court of the reasons for the decision and the standards applied by the court that governed its determination and persuaded it to arrive at the decision. *Andrews v. Board of County Commissioners*, 207 Kan. 548, Syl. ¶ 6, 485 P.2d 1260 (1971).

Here, the trial court's finding that the straw had been strewn throughout the Mells' yard, which was supported by undisputed evidence at the suppression and *Franks* hearings, was more than adequate to resolve the issue raised and preserved by the Mells: Procaccini had made both a false and a deliberate and material omission in his affidavit when he stated that the straw was located only in the area of the plants. See *Littrice v. State*, 31 Kan. App. 2d 846, 850-51, 75 P.3d 292, *rev. denied* 276 Kan. 969 (2003) (Where the trial court failed to specifically determine that the affidavit for search warrant contained deliberate and material omissions of material fact or that certain statements in the affidavit

were material statements of deliberate falsehood or statements made in reckless disregard for the truth, this court was able to make the determination based upon the trial court's findings and the appellate record.).

Second, it is disingenuous for the dissent to say on the one hand that we must accept Procaccini's statement that the straw was only in the area of the marijuana plants and on the other hand completely ignore the record: the trial court's findings, Howard's testimony, the pictures showing that straw had been strewn all over the yard, and the State's concession that "the straw was spread throughout the . . . entire yard." Moreover, as we stated earlier, the Mells have preserved their right to challenge on appeal the trial court's failure to excise Procaccini's statement about the straw omission.

The record, in particular, shows that the Mells requested and received a *Franks* hearing. They raised the deliberate and material straw omission issue before the trial court under sworn testimony. On appeal, the Mells again challenge the honesty of the information contained in the search warrant affidavit. See *State v. Shively,* 26 Kan. App. 2d 302, Syl. ¶ 5, 987 P.2d 1119 (1999), *aff'd* 268 Kan. 589, 999 P.2d 259 (2000) ("When a defendant fails to challenge the honesty of the information in a search warrant affidavit by offering proof under oath and requesting a *Franks* hearing, he or she cannot challenge on the appeal the honesty of the statements in the affidavit as presented to the magistrate."). Because the Mells offered proof under oath and asked for a *Franks* hearing, they have preserved their right to challenge on appeal the deliberate and material omission about the straw.

Turning our attention once again to the affidavit, we note that there was no mention in the affidavit that the marijuana plants were growing among other weeds and that the area had not been mowed. Again, the failure to mention these things would have given the magistrate a false implication that the plants were being tended to.

B. *Misleading Information*

Paragraph 3 of the affidavit is misleading because it suggests that Howard had identified the plants as marijuana from the sidewalk,

which was 30 to 40 feet from where the plants were located. Indeed, the pictures of the marijuana plants show that they were growing among other weeds of approximately the same height.

The dissent, however, ignores the material and deliberate straw omission previously discussed and the misleading information contained in the affidavit and argues that the facts outlined in the dissent furnished sufficient probable cause to issue the search warrant. Nevertheless, these facts failed to show that a nexus existed between the marijuana plants and the Mells' residence. Even George's stale cocaine and drug paraphernalia arrest in 2000, which is mentioned in the affidavit and by the dissent, lacks a nexus to the Mells' residence. See *State v. Hicks*, 282 Kan. 599, 616, 147 P.3d 1076 (2006) (The defendant's drug history was extremely stale and could not, without more, furnish a basis to believe that drugs would be found at the residence.). Nothing in the affidavit connects the cocaine and drug paraphernalia arrest in 2000 with the Mells' residence. See *State v. Malm*, 37 Kan. App. 2d 532, 545, 154 P.3d 1154, *rev. denied* 284 Kan. 949 (2007) ("There was no indication that the conviction was in any way related to Malm's residence.").

Moreover, the affidavit indicates that Nancy's stale drug paraphernalia arrests in 2002 and 2003 were made in connection with her driving on a suspended license. This court's decision in *Malm* is illustrative. In *Malm*, the officers seized drug paraphernalia from a defendant's van. The seizure of the drug paraphernalia, along with several other factors, was used to obtain a search warrant for the defendant's residence. In the search of the defendant's residence, the officers discovered methamphetamine and materials connected with the manufacture of methamphetamine. After the trial court denied his motion to suppress the items taken from the van, the defendant moved to suppress the evidence seized from the residential search; this motion also was denied. On appeal, the State maintained that the officers' seizure of the drug paraphernalia evidence from the defendant's van, together with several other factors, constituted a nexus between the criminal activity and the defendant's residence.

The *Malm* court, however, rejected the State's proffered nexus. In doing so, the *Malm* court pointed out that if it accepted the

State's proffered nexus, the probable cause requirement would be rendered practically meaningless. 37 Kan. App. 2d at 545-46. The *Malm* court further noted that under the State's position, "a nexus to the suspect's residence could be established in almost every case where the suspect is arrested while driving a vehicle." 37 Kan. App. 2d at 546. As a result, the *Malm* court determined that the affidavit failed to establish probable cause to search the defendant's home. 37 Kan. App. 2d at 546. Based on *Malm,* Nancy's drug paraphernalia arrests made in connection with her driving a car, without more, were insufficient to show that a nexus existed between the drug paraphernalia arrests and her residence.

The home has always been held in high regard under the Fourth Amendment to the United States Constitution. This amendment, which was made applicable to the states through the Fourteenth Amendment, protects "the right of the people to be secure in their persons, *houses,* papers, and effects, against unreasonable search and seizures." (Emphasis added.) U.S. Const. Amend. IV. Moreover, our Supreme Court has stated the following about the home: " 'The Fourth Amendment protects a citizen's reasonable expectations of privacy and one's reasonable expectation of privacy in the *home* is entitled to unique sensitivity. [Citations omitted.]' " (Emphasis added.) *State v. Reno,* 260 Kan. 117, 128, 918 P.2d 1235 (1996).

Still, the dissent implies that the factual shortcomings of the affidavit can be overlooked because Procaccini, the affiant, had attended several courses on narcotics investigation and had investigated numerous narcotics cases. Although this court has stated that an officer may have special knowledge in determining whether criminal activity has occurred, this knowledge is not enough to justify a finding of probable cause:

"The State suggests the factual inadequacies of the affidavit should be overlooked because the affiant was a KBI agent. While we recognize a KBI agent may have special expertise in determining whether criminal activity has been or is being committed, that alone will not justify a finding of probable cause by a neutral and detached magistrate. Mere conclusions of the affiant are not sufficient." *State v. Jacob,* 8 Kan. App. 2d 729, 731, 667 P.2d 397 (1983).

In paraphrasing Procaccini's statements taken from the affidavit, the dissent states:

"Procaccini had attended several courses on narcotics investigation and has participated in the investigation of numerous narcotics cases. Based on his training and experience, drug traffickers and users commonly have paraphernalia (including packaging) in their possession, and those who cultivate marijuana often have starting pots, fertilizer, grow pots, and literature about marijuana cultivation in their possession." 39 Kan. App. 2d at 501.

These are speculative statements; they also are conclusory. As a result, the statements are scarcely sufficient to show the presence of criminal activity.

In summary, the marijuana plants were growing among other weeds. This court has previously recognized that marijuana grows wild throughout much of Kansas. See *State v. Brown*, 2 Kan. App. 2d 379, 380-81, 579 P.2d 729 (1978). Moreover, the affidavit sets forth no evidence of any materials used to cultivate marijuana being found near the plants. See *State v. Weiss*, 155 Vt. 558, 563, 587 A.2d 73 (1990) ("The presence of defendants at the marijuana patch with common household items created a link between the residence and the site sufficient for the court to lawfully authorize the search warrant."). Further, there is no evidence of a well-worn path between the plants and the Mells' residence. See *United States v. Emmons*, 24 F.3d 1210 1214-15 (10th Cir. 1994) (probable cause existed to search defendant's home when "very distinct trails" led from house to marijuana plants). Moreover, the mere presence of marijuana does not imply that marijuana is being cultivated or that any of it has been harvested. *Jacob*, 8 Kan. App. 2d at 731; *Brown*, 2 Kan. App. 2d at 380-81. As a result, the affidavit did not establish a sufficient nexus between the Mells' house and the marijuana plants on their property.

Our research has revealed that even in cases where a search warrant of a defendant's residence has been sought based upon the discovery of marijuana plants growing close to the residence, there has been a showing that the marijuana plants were being cultivated or tended to. See *Houser v. Geary*, 465 F.2d 193, 196 (9th Cir. 1972) (probable cause existed to search residence when cultivated marijuana found growing in hothouse close to residence); *People v. Krug*, 38 Ill. App. 3d 383, 384-86, 347 N.E.2d 807 (1976) (holding that probable cause existed for issuance of search warrant for

defendant's home where officer discovered 60 cultivated marijuana plants growing close to defendant's residence); *State v. Hall,* 168 Vt. 327, 331, 719 A.2d 435 (1998) (holding that probable cause existed because the marijuana plant was not simply growing in an untended area of defendant's backyard near his house, but the lawn around the plant had been mowed and the plant had been tied to a fishing line, indicating that the plant had been carefully cultivated). If we were to accept the dissent's argument and follow the dissent's one aberrant decision, a nexus to a homeowner's residence could be established by the mere fact of a few marijuana plants growing outside the fenced area of the homeowner's yard. This would make the probable cause requirement of no import. See *Malm,* 37 Kan. App. 2d at 546.

Indeed, in rejecting the dissent's position, the California Court of Appeals held in *People v. Pellegrin,* 78 Cal. App. 3d 913, 917, 144 Cal. Rptr. 421 (1977), that a nexus to a defendant's home was lacking because the magistrate was not presented with any facts indicating marijuana was being cultivated in the defendant's backyard. The court further declared: "Without a showing the marijuana was not growing wild there are no facts from which it can be inferred contraband was in the defendant's home. [The officer's] conclusory statement [in the affidavit]: 'Such plant did not appear to be growing wild' was of no assistance to the magistrate." *Pellegrin,* 78 Cal. App. 3d at 917. The court's reasoning in *Pellegrin* is strikingly similar to this court's reasoning in the previously cited cases of *Jacob* and *Brown*: that marijuana grows wild and that the mere presence of marijuana does not imply that it is being cultivated or that any of it has been harvested. As a result, *United States v. Malin,* 908 F.2d 163 (7th Cir.), *cert. denied* 498 U.S. 991 (1990), which the dissent heavily relies upon, will not bear the weight of reliance which the dissent attaches to this case.

Concluding that the magistrate had been misled, the trial judge stated: "I think in this case [the magistrate] was misled in his decision because of the fact that information contained in the affidavit for search warrant, some of it was erroneous or misleading and some of it needs to be excised due to my findings in this case." Had the magistrate been told about the omitted information pre-

viously discussed and the misleading information and paragraph 5 had been deleted, he would have been left with the following facts in determining whether probable cause existed to search the Mells' residence:

1. That two officers saw "approximately 11 plants," which they believed to be marijuana, growing among other weeds in an untended area of the Mells' backyard.
2. That straw was scattered throughout the yard.
3. That Nancy may have had knowledge of the plants' presence.
4. That George had one stale cocaine and drug paraphernalia arrest, which did not involve his residence.
5. That Nancy had two stale drug paraphernalia arrests, which did not involve her residence.

From this set of facts, the magistrate would have been required to find that the Mells were cultivating or harvesting marijuana in their yard. Such a finding would have provided a link between the Mells' residence and the marijuana plants and would establish a substantial basis for concluding that probable cause to search the residence existed. As stated previously, however, such a finding was not and could not be made based on the record in this case.

First, the presence of marijuana growing in an untended area of the Mells' backyard does not show the presence of illegal drugs in the residence. Marijuana, as we stated previously, grows wild throughout much of Kansas. See *Brown*, 2 Kan. App. 2d at 380-81. Second, there is no indication in the affidavit that the growing marijuana was being cultivated or that any of it had ever been harvested. The affidavit, for example, does not state that the plants were growing in rows or in a pattern or that there were any cultivation tools or fertilizer found near the plants. The affidavit does not indicate that there was a water hose near the marijuana plants or that there was any other evidence of irrigation or pruning of the plants. Moreover, the affidavit does not even state the approximate size of the plants. Based on the pictures entered into evidence, the plants looked to be only 6 to 8 inches in height, and they were scattered about in no discernable pattern. Further, in its appellate brief, the State concedes that the Mells were not attempting to

conceal the marijuana plants: "[The straw's] purpose was to aid in the growth of a new stand of grass and not concealment. . . . The Mell[s] took no measures to hide the area where the marijuana plants were located." Importantly, this lack of concealment runs counter to the State's and the dissent's assertion that the Mells were involved in a criminal activity establishing a sufficient nexus to the Mells' residence.

In short, there was nothing to tie the Mells' residence to the plants except the presence of growing but uncultivated and un- harvested marijuana plants in an untended area of their backyard and Nancy's statements about the plants. Moreover, there was nothing in Nancy's statements to the officers that would have es- tablished a link between the residence and the marijuana plants or that would have indicated the plants were being cultivated. The affidavit's absence of cultivation evidence is significant because it failed to eliminate the distinct possibility that the marijuana was growing wild. See *Brown*, 2 Kan. App. 2d at 280-81, and *Pellegrin*, 78 Cal. App. 3d at 917.

Consequently, without facts in the affidavit indicating that the growing marijuana was being cultivated or harvested, there were no facts from which a magistrate could have inferred that there was a fair probability that illegal drugs would be found in the Mells' residence. Given these facts, Nancy's possible knowledge of ma- rijuana plants growing among other weeds in an untended portion outside of the fenced-in area of her backyard does not support an inference that illegal drugs will be found in her residence. Stated another way, a person's knowledge about something that has not been shown to be criminal obviously does not furnish probable cause to suspect that person of a criminal activity.

Moreover, even if a person had knowledge of a criminal activity, this knowledge alone would not support an inference that the per- son was involved in the criminal activity. See *State v. Quigley*, 179 Vt. 567, 573, 892 A.2d 211 (2005) ("Having not previously estab- lished a rule that a person's knowledge of criminal activity is nec- essarily probable cause to suspect that person of the criminal ac- tivity, we decline to do so in this case.").

Although the facts in this case may give rise to suspicion, they do not "establish a substantial basis for the existence of probable cause" to search the Mells' residence. See *Hicks*, 282 Kan. at 617. Without some evidence establishing cultivation or harvesting of the marijuana plants or evidence directly linking the marijuana plants to the residence, the affidavit was insufficient for the issuance of a search warrant of the Mells' residence. As Justice Beier aptly stated in *Hicks*: "The parts are weak, and the whole is not greater than the sum of them." 282 Kan. at 617. In summary, we conclude that had the magistrate been told about the omitted material information previously discussed and about the misleading information, "the combined bits and pieces of information would have failed to establish that probable cause existed under the totality of the circumstances." See *State v. Hendricks*, 31 Kan. App. 2d 138, 144, 61 P.3d 722 (2003).

### IV. Is the Good-Faith Exception Applicable to This Case?

In its brief, the State makes no argument regarding application of the good-faith exception to the exclusionary rule under *United States v. Leon*, 468 U.S. 897, 82 L. Ed. 2d 677, 104 S. Ct. 3405, *reh. denied* 468 U.S. 1250 (1984). Therefore, we determine that the State has waived any argument under *Leon*. See *Hicks*, 282 Kan. at 617-18 (where State failed to pursue argument under *Leon*, our Supreme Court regarded argument as waived); see also *State v. Landis*, 37 Kan. App. 2d 409, 423, 156 P.3d 675, *rev. denied* 284 Kan. 949 (2007) (holding that the State's failure to make an argument regarding the application of the *Leon* good-faith exception on appeal is deemed waived). Moreover, an issue not briefed on appeal is deemed abandoned. *State v. Seck*, 274 Kan. 961, 965, 58 P.3d 730 (2002).

In addition, the Mells maintain that the *Leon* good-faith exception does not apply. We agree. The affidavit in this case was misleading due to omissions and false implications by the police. See *Reno*, 260 Kan. at 132. Consequently, *Leon*'s exception to the exclusionary rule is inapplicable.

Affirmed in part, reversed in part, and remanded for trial without the evidence seized from the searches of the Mells' residence.

LEBEN, J., concurring and dissenting: I agree with the majority that (1) Officer Rick Howard did not invade the curtilage of the Mells' home when he walked onto the side yard; (2) the warrantless search of the Mells' home was not justified by exigent circumstances, which requires that paragraph 5 be excised from Detective Aaron Procaccini's probable-cause affidavit; and (3) the State has waived any claim that a good-faith exception to the exclusionary rule applies here. But I respectfully dissent from the court's conclusion that the affidavit provided an insufficient basis for the issuance of a search warrant for the Mells' home. I would find that the affidavit sets forth sufficient facts to justify the warrant.

*The Probable-Cause Affidavit Provided Sufficient Facts to Support the Magistrate's Conclusion that There Was a Reasonable Probability that Evidence of a Crime Would Be Found in the Mells' Home.*

Even with paragraph 5 removed, the affidavit provided this relevant information:

- Officer Howard observed several plants he believed were marijuana plants in the side yard of the residence.
- Nancy Mell, a resident of the home, saw Howard looking in the direction of the plants. She said, "Do you see that?" He replied, "The weeds?" She continued, "Are those what I think they are?" When Howard looked more closely, Mell said that her neighbor had been mowing around those plants for the past month, confirming that she had seen them before. Nancy Mell told Howard that she had wanted him to remove the plants.
- Another officer, Detective Procaccini, came to the scene. He counted 11 plants that he believed were marijuana plants growing on the Mells' property. The plants were close enough to the Mells' back porch that Nancy Mell was able to talk with Procaccini while he was looking at the plants. She told him that her husband had just planted grass in that area and speculated that marijuana seeds might have been mixed in with the grass seed. She also asked, "Could it be possible that a dog or a bird ate the seeds and pooped in my yard?"

- Procaccini noticed straw on the ground in the area where the marijuana plants were growing but not in any other location on that side of the Mells' house.
- Procaccini tested a portion of one plant with a field-test kit. The test was positive for marijuana.
- At the time of submission of the affidavit, a check of criminal records showed that Nancy Mell had prior arrests within the last 4 years for possession of drug paraphernalia, and George Mell had an arrest 6 years ago for possession of cocaine and possession of drug paraphernalia.
- Procaccini had attended several courses on narcotics investigation and has participated in the investigation of numerous narcotics cases. Based on his training and experience, drug traffickers and users commonly have paraphernalia (including packaging) in their possession, and those who cultivate marijuana often have starting pots, fertilizer, grow pots, and literature about marijuana cultivation in their possession.

Based upon the affidavit, the magistrate found probable cause to believe the crimes of cultivation of marijuana, possession of marijuana, and possession of drug paraphernalia were being committed. The magistrate concluded that there was a fair probability that contraband or evidence of a crime would be found in the house and approved a search warrant for it.

The majority properly notes that the magistrate only needs to conclude that there is a "fair probability" that contraband or evidence of a crime will be found in a particular place. See *State v. Hicks*, 282 Kan. 599, Syl. ¶ 1, 147 P.3d 1076 (2006). Further, our review of the magistrate's finding of probable cause is inherently deferential—we need only find that the affidavit provided a "substantial basis for the magistrate's determination that there is a fair probability that evidence will be found in the place to be searched." We do not second-guess the magistrate by determining whether, as a matter of law, probable cause actually existed. *Hicks*, 282 Kan. 599, Syl. ¶ 2. The standard set forth in *Hicks* is met here.

An officer saw 11 marijuana plants growing in the Mells' yard; they were close enough to the back porch that the officer could have a conversation with Nancy Mell while he was looking at the

plants. Nancy Mell's comments were inconsistent and suspicious. She told Officer Howard that the neighbor had been mowing that area and had mowed around the plants. She told Detective Procaccini that her husband had recently planted new grass in that area. She also suggested a rather unusual means for the plants to have gotten there. In the side yard, straw was on the ground only in the area of the marijuana plants, suggesting some cultivation activity there. And both Nancy and George Mell had prior drug arrests.

Taking all of these facts into account, there is enough to support the issuance of a warrant for the home. The facts must be considered as a whole, see *Hicks*, 282 Kan. at 613-14, and caselaw explicitly tells us that some of these facts provide substantial support for the issuance of a warrant, at least when other facts also support a finding of probable cause. Prior arrests of a similar nature may be used to establish probable cause for a search warrant. *State v. Ruff*, 266 Kan. 27, Syl. ¶ 9, 967 P.2d 742 (1998); *State v. Isaacson*, No. 90,231, unpublished opinion filed July 22, 2005. The contradictory and implausible and frankly bizarre statements provided by Nancy Mell to officers also support a finding of probable cause here. See *State v. Romo-Uriarie*, 33 Kan. App. 2d 22, 35-36, 97 P.3d 1051, *rev. denied* 278 Kan. 851 (2004) (finding that defendants' inconsistent statements and implausible explanations, when combined with other factors, contributed to a finding of probable cause). And the majority concedes that evidence of cultivation is significant. Straw placed over an area in which new plants are growing—whether they be marijuana plants or lawn grass or some of both—is evidence of cultivation, as was Nancy Mell's statement that her husband had recently planted seeds in the area of the marijuana plants.

To be sure, some cases have found that the mere presence of marijuana plants in or near the yard of a home does not give cause for a search warrant for the home. *E.g., People v. Pellegrin*, 78 Cal. App. 3d 913, 144 Cal. Rptr. 421 (1977) (observation of one marijuana plant in defendant's backyard was insufficient basis for search warrant of home). But we have much more than the mere presence of some marijuana plants here, and I believe that the decision of

the United States Court of Appeals for the Seventh Circuit in *United States v. Malin*, 908 F.2d 163 (7th Cir.), *cert. denied* 498 U.S. 991 (1990), is persuasive and attuned to the deferential standard set forth in *Hicks*.

In *Malin*, the court held that the observation of six marijuana plants growing in the backyard of a residence gave sufficient cause for a search warrant for the home. The court properly noted that the evidence at hand indicated that it would be reasonable to seek evidence in the home, even though the evidence was indirect and there might be an innocent explanation:

"Concededly, [the officer's] complaint did not directly link the marijuana to the house. Direct evidence, however, is not necessary to a probable cause determination. [Citation omitted.] 'In dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' [Citations omitted.] A judge making a probable cause determination 'need not determine that the evidence sought is *in fact* on the premises to be searched . . . or that the evidence is more likely than not to be found where the search takes place. . . . [The judge] need only conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit.' [Citation omitted.] In reaching his conclusion, a judge 'is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense.' [Citations omitted.] In this case, [the officer's] observation of marijuana growing in Malin's yard reasonably yielded the conclusion that marijuana or other evidence of marijuana possession would be found in Malin's house. [Citation omitted.]

"Malin makes much of the fact that [the officer's] complaint cited no evidence establishing that the marijuana was cultivated (although the marijuana was in fact cultivated). Malin argues that [this] failure to cite evidence of cultivation precluded the issuing judge from reasonably inferring that marijuana would be found in the house. We disagree. While evidence of cultivation would have informed the probable cause determination, it was not necessary. Malin implies that an innocent explanation (*i.e.*, that the marijuana grew wild) negated the inference that criminal evidence would be found in the house. To provide probable cause, however, a complaint for a search warrant 'need only allege specific facts establishing a reasonable probability that the items sought are likely to be at the location designated; the [complaint] need not also negate every argument that can be asserted against that probability.' [Citations omitted.] Although [the officer's] complaint contained less than optimum information, it provided enough for the issuing judge to find probable cause." *Malin*, 908 F.2d at 165-66.

Our case has much stronger evidence in support of the search warrant than found in *Malin*. In addition to the presence of 11 marijuana plants in the Mells' yard within a short distance of the back porch, we have Nancy Mell's admission that she knew they were there, her inconsistent explanations about how they might have gotten there, her statement that her husband had recently planted seeds in that very area, the presence of straw only around the plants in that area of the yard, and prior arrests of both Nancy and George Mell for possession of drug paraphernalia.

*The Majority Improperly Analyzes Facts Supporting Probable Cause in Isolation and Usurps the District Court's Function as Fact-finder.*

The majority takes two approaches in arguing against the conclusion that the facts in the affidavit provided sufficient support for the issuance of the warrant. First, they attempt to cabin each fact separately, often citing a case that indicates that this fact *alone* does not provide probable cause to search a residence. Second, they have usurped the role of the trial court to make factual findings related to the issues before us.

*The Facts—and the Reasonable Inferences from Them—Must Be Considered as a Whole.*

Each fact is not a lone cabin in the wilderness; taken together, a cluster of cabins indicates a community rather than isolation. The facts set forth in the affidavit must be considered as a whole, not separately. See *State v. Ramirez*, 278 Kan. 402, 406-7, 100 P.3d 94 (2004) (probable-cause determination must consider all facts together "rather than evaluating each suspicious factor in isolation and asking whether there was an innocent explanation for the activity"). The majority does not follow this rule. For example, the majority cites *State v. Malm*, 37 Kan. App. 2d 532, 154 P.3d 1154, *rev. denied* 284 Kan. 949 (2007), for the proposition that an arrest for possession of drug paraphernalia found in a vehicle doesn't provide probable cause to search the person's home. But here we have prior drug-related offenses *plus* marijuana growing within

steps of the back porch of the home *plus* inconsistent statements *plus* cultivation in the area of the plants.

The majority also cites evidence—not found in the affidavit—that it contends eliminates inferences of cultivation or illegal activity by the Mells. For example, the majority notes that evidence was presented in the suppression hearing that weeds were growing around the marijuana plants and that the area had not been mowed. Even if that information were properly before us in reviewing the magistrate's decision to issue the warrant, however, it only presents one lens through which the information might be viewed as possibly innocent. But "[t]he fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause." *United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985). And there is strong evidence in the affidavit contrary to the majority's contention that cultivation inferences were eliminated by this other testimony. Nancy Mell said her neighbor had been mowing around the plants for a month; Nancy Mell said her husband had recently planted grass in the area of the plants; and straw had been placed around the marijuana plants. The facts—and the inferences created from them—do not magically disappear from the affidavit in the face of some contrary information for our purpose of determining what the magistrate could consider fairly probable on the information before him.

### *The Majority Has Taken Over the Role of Fact-finder, Even to the Extent of Making Credibility Determinations that Should Only Be Made by the District Court.*

The majority does not explicitly find that the testimony of Detective Procaccini or Officer Howard lacked credibility. But it has implicitly done so. Without doing so, the majority could not find that material misrepresentations and omissions were made in the affidavit. We are thus required to review the magistrate's decision based solely on the information contained in the affidavit. As already discussed, that information provided a sufficient basis for the issuance of the warrant to search the Mells' home.

The majority correctly notes that the district court held an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 57

L. Ed. 2d 667, 98 S. Ct. 2674 (1978). At such a hearing, the defendant has the burden to prove by a preponderance of the evidence that a material misstatement or omission in the affidavit exists and that it was either intentionally misrepresented or omitted or presented in reckless disregard for the truth. 438 U.S. at 155-56. Reckless disregard for the truth in this context means that the affiant actually had serious doubts about the truth of the allegations. *Hernandez v. Conde*, 442 F. Supp. 2d 1131, 1139 (D. Kan. 2006); see also *St. Amant v. Thompson*, 390 U.S. 727, 731, 20 L. Ed. 2d 262, 88 S. Ct. 1323 (1968) (reckless disregard for the truth in libel claims requires that defendant "in fact entertained serious doubts as to the truth" of the statement made). We must review the proof as presented in the affidavit to the magistrate unless the Mells show both that there has been a material misrepresentation or omission in the affidavit and that this was either intentional or in reckless disregard for the truth. See *Franks*, 438 U.S. 154; *Hicks*, 282 Kan. at 612; *State v. Landis*, 37 Kan. App. 2d 409, 415, 156 P.3d 675, *rev. denied* 284 Kan. 949 (2007). The district court here made no finding that Detective Procaccini made *any* intentional or reckless misstatement or omission in the affidavit.

In support of its claim that the affidavit contained materially false or misleading information, the majority cites two of the district court's statements—about the straw in the Mells' yard and misleading statements in the affidavit—but both are taken out of context. First, the district judge did say that "there was evidence that there was straw throughout the lawn." But the judge did *not* make that statement as part of any finding that the affidavit was materially false or misleading or that Detective Procaccini had intended to mislead anyone. Instead, the district court referenced the straw only in support of its erroneous ruling that the marijuana plants were within the curtilage of the home. In explaining the curtilage ruling, the judge went through several factors that are to be considered in determining whether an area is within the curtilage, including steps—like placing straw—that might protect the area from observation:

"And four, the steps taken by the resident to protect the area from observation by people passing by. There was evidence that these marijuana plants, few ma-

rijuana plants, were interspersed with grass. I think it's also important on this issue to mention another fact that I had not mentioned up to now . . . that *there was evidence that there was straw throughout the lawn* of the Mell residence, straw in the back, straw in the front, and all of this straw would be in the nature of what you put down to try to get a new stand of grass, and that was throughout. *I think that is important on factor four, the steps taken by the resident to protect the area from observation by people passing by.*" (Emphasis added.)

The judge did not suggest that he considered the existence of straw in other areas of the lawn significant to any issue other than whether the plants were within the home's curtilage. And he certainly did not suggest that the officers intended to mislead the court about where they saw straw on their initial visit to the Mells' home.

The evidence that may be considered differs significantly in determining whether to strike part of the affidavit based upon an intrusion into the curtilage of the home as compared to reviewing the magistrate's overall decision to issue the warrant. The curtilage issue was based on a claim that officers had violated the Mells' Fourth Amendment rights in a warrantless entry of the home's curtilage; the Mells argued that no information obtained during such an incursion could be considered. Once that issue was raised in a motion to suppress, the State had the burden of proving the lawfulness of the officers' intrusion into what the Mells claimed was the home's curtilage. See *State v. Fisher*, 283 Kan. 272, 284, 154 P.3d 455 (2007); *State v. Anguiano*, 37 Kan. App. 2d 202, 204-05, 151 P.3d 857 (2007). Thus, on that issue, the district court was free to consider all the evidence presented before it about what was within the home's curtilage and to make the appropriate factual findings. In otherwise reviewing the magistrate's issuance of the warrant, the district court—and our court—must base that review on the facts contained in the affidavit, excluding only those allegations that are materially false or contain material omissions, and only if the false statement or omission was made intentionally or in reckless disregard for the truth. See *State v. Jensen*, 259 Kan. 781, Syl. ¶ 1, 915 P.2d 109, *cert. denied* 519 U.S. 948 (1996). The majority has gone well beyond the affidavit's facts.

Second, the majority cites the statement of the district court that the magistrate "was misled in his decision because of the fact that

information in the affidavit for search warrant, some of it was erroneous or misleading and some of it needs to be excised due to [the district judge's] findings in this case." The majority tries to tie the district judge's statement directly to the majority's conclusion that some statements in the affidavit were materially false or materially omitted. Nowhere in the district judge's findings does he tie his statement to any of the claims discussed here by the majority. Rather, the things the district judge cited as misleading are matters that we have found were proper (since there was no incursion onto the home's curtilage):

"[W]here these plants were, these were on the curtilage of the Mell property. In the affidavit Officer Howard indicated or it was implied that he located several plants in the yard of the residence. What he candidly testified to at the motion to suppress hearing was that he could see some vegetation but that he could not identify that vegetation as being marijuana plants from his vantage point. . . . Officer Howard advised the affiant that he had located several plants in the yard of the residence and believed they were marijuana plants. That is true, but *it's misleading because he didn't know that until he intruded to the rear of the residence and examined the plants*. I would find that intrusion exceeded the scope of a lawful intrusion because it was onto the curtilage of the property." (Emphasis added.)

The district court's finding that one statement was misleading because the magistrate was not told that the officer had intruded onto the home's curtilage is certainly of no consequence since we have determined that the plants weren't located in the curtilage. Further, even if the district judge *had* found some material misrepresentation or omission, the district court's ruling didn't even hint that Detective Procaccini intentionally misled the magistrate or acted in reckless disregard for the truth.

The majority also cites a statement in discussion of the curtilage issue from the State's brief that "straw was spread throughout the Mells' entire yard." As I've already noted, the State had to address *all* the evidence when it discussed the curtilage issue, while our review on the issuance of the warrant is limited to the affidavit—unless there was a deliberate and material misrepresentation or omission, or one in reckless disregard for the truth. As to the evidence of the straw's placement for purposes of attacking the affi-

davit, George Mell's brief provided this summary of Officer Howard's testimony:

"Upon cross-examination at the suppression hearing, Officer Howard indicated that he determined the marijuana plants were intentionally planted because he saw straw around the bottom of the plants, and the straw was not anywhere besides that area. He did indicate that there was some straw in the front by the sidewalk . . . [and] agreed there was some straw upon the ground, at the side of the house."

Even as summarized by the defense, Officer Howard's testimony did not directly contradict Detective Procaccini's statement in the affidavit that Procaccini noticed straw in the area where the plants were growing, but not elsewhere on that side of the house. The differences are subtle and certainly do not suggest intentional misrepresentation. Thus, in order to find on this record that Procaccini intentionally misled the magistrate in the affidavit about what his observations of the straw's placement, we would have to make an adverse credibility determination regarding the testimony of Howard or Procaccini or both.

It is not our job to make credibility determinations after a contested evidentiary hearing. We are an appellate court. We may not step in and find that Detective Procaccini deliberately misled the magistrate by omitting information about straw in other areas of the yard when the district court did not strike that paragraph from the affidavit—and that issue was squarely presented in the hearing. The most that an appellate court can do in this circumstance would be to remand for additional factual findings by the district court. But it seems unnecessary to do so here, given the testimony and the lack of any previous hint from the district judge that he found any of the officers' testimony lacking in credibility.

Without making some adverse credibility findings about the testimony of one or both officers, there certainly is not sufficient evidence in the record to conclude that Detective Procaccini deliberately misled the magistrate. As noted earlier, Officer Howard testified that he noticed straw in the area of the marijuana plants only right around the plants themselves. That was consistent with Detective Procaccini's sworn affidavit, which was presented to the magistrate. Thus, for purposes of our review of the magistrate's

decision in issuing the warrant, we must accept the statement in the affidavit on this point. The placement of straw specifically around the marijuana plants—but not in any immediately adjacent area—raises the inference of cultivation activity there.

For argument's sake, though, let's grant the majority's claim that the district court intended to state a factual finding that straw was, in fact, throughout every part of the yard. This still is not cause to strike any portion of the affidavit without a finding by the district court that there was a deliberate misrepresentation or omission. But the majority claims that this supposed finding about the existence of straw throughout the yard disproves any possible inference of cultivation of the 11 marijuana plants. It does not. A person can certainly grow both grass and marijuana on the same property at the same time. Until the marijuana plants become taller than the nearby grass, both the straw and the grass would serve to distract attention from the newly sprouted marijuana plants, and the straw would also protect the plants as they grow. The straw's placement over the area of the marijuana plants suggests active cultivation in that area—regardless of where else in the yard straw is placed. Active cultivation may be considered along with the rest of the evidence in determining probable cause for the issuance of a warrant.

*We Cannot Negate the Inference of Illegal Activity from Marijuana Plants Growing with the Owner's Knowledge within Feet of the Back Porch of a City Residence by Taking Judicial Notice that Marijuana Sometimes Grows Wild.*

The majority's final step in negating any inference of criminal activity from the 11 marijuana plants is its citation of two prior cases in which this court noted that marijuana grows wild in parts of Kansas. See *State v. Jacob*, 8 Kan. App. 2d 729, 731, 667 P.2d 397 (1983); *State v. Brown*, 2 Kan. App. 2d 379, 380-81, 579 P.2d 729 (1978). From this, the majority concludes that the 11 marijuana plants within feet of the Mells' back porch provide no inference of cultivation by the Mells and thus no nexus to the Mells' home. I am unable to find any authority to justify the court's initial decision in *Brown* to "take judicial notice of the fact that marijuana

grows wild throughout most of Kansas." 2 Kan. App. 2d at 380-81. Perhaps Kansas was a different place in 1978. But K.S.A. 60-409 allows a court to take judicial notice only of "such facts as are so generally known or of such common notoriety within the territorial jurisdiction of the court that they cannot reasonably be the subject of dispute." Further, both *Jacob* and *Brown* involved farmsteads, not city dwellings. I certainly do not believe we can take judicial notice that marijuana is often found within a few feet of the back porch of most homes in Ottawa. Even if we were to grant that assumption, however, it would not negate the justification for a search warrant. As the court noted in *Malin*, the affidavit in support of a search warrant need not negate every innocent possibility for the evidence noted in it.

I would uphold the validity of the search warrant here for the Mells' home.